**UNITED STATES, Plaintiff,**

**v.**

**Nicholas L. BISSELL, Jr., Barbara J. Bissell, Defendants.**

**Crim. A. No. 95–539 (AJL).**

United States District Court,
D. New Jersey.

Dec. 13, 1996.

Faith S. Hochberg, United States Attorney, Stuart A. Rabner, Perry Carbone, Kimberly M. Guadagno, Asst. U.S. Attys., Newark, New Jersey, for U.S.

Donald R. Belsole, Kevin Weinman, Belsole & Kurnos, Morristown, New Jersey, for Nicholas L. Bissell, Jr.

Rita E. Donnelly, South Orange, New Jersey, for Barbara J. Bissell.

## TABLE OF CONTENTS

Facts ............................................................... 850

 The Second Superseding Indictment ........................................ 850
 A. Background ......................................................... 850
 B. Counts 1–11: Violation of the Public Trust ............................... 851
 1. Failure to Disclose Business Relationship With Adversary ............... 852
 2. Extortion by Abuse of Office ....................................... 852
 3. Conduct Which Compromised the Office of the Somerset County Prosecutor; Failure to Act Honestly in the Conduct of Nicholas Bissell's Office ......................................................... 852
 4. Mailings in Furtherance of Unlawful Behavior ......................... 853
 C. Counts 12–16: Defrauding An Investor in the Bedminster Station ............ 853
 D. Count 17: Fraud on the Investors in the Somerset Station .................. 854
 E. Count 18: Fraud on the Distributor ..................................... 855
 F. Count 19: Financial Aid Fraud ......................................... 855
 G. Count 20: Obstruction of Justice ...................................... 856
 H. Count 21: Perjury During a Civil Proceeding ............................ 856
 I. Count 22: False Statements to Federal Agents ........................... 856
 J. Count 23: Conspiracy to Defraud the IRS ............................... 857
 K. Counts 24–27: Evasion of Personal Income Taxes ........................ 857
 L. Counts 28–30: Subscribing to False Returns ............................ 858
 M. Counts 31–33: Aiding and Assisting in the Filing of a False Return .......... 858

Discussion ........................................................... 858

 A. Summary of Pending Motions .......................................... 858
 B. Motion to Dismiss Counts 1–11 of the Second Superseding Indictment ........ 860
 1. Background ....................................................... 860
 2. Standards for Dismissal of an Indictment ............................. 860
 3. Failure to Provide Honest Services .................................. 861
 4. Retroactivity Argument ............................................ 863
 C. Motion to suppress Videotapes ........................................ 864
 1. Background ....................................................... 864
 2. Testimony of Robert Krut .......................................... 864

 3. Reasonable Expectation of Privacy ..................................... 865
 4. Validity of Thornburg Consent........................................ 867
 D. Motion by Nicholas Bissell for Production of Unredacted Copy of LaRose 15 April 1995 Affidavit and Motion by the Government for a Protective Order... 867
 E. Pretrial Disclosure of Brady and Giglio and Jencks Act Material; Motion for Reciprocal Discovery............................................... 868
 1. Brady Material ..................................................... 868
 2. Giglio Material .................................................... 869
 3. Jencks Act Material ................................................ 870
 4. Motion for Reciprocal Discovery ..................................... 871
 F. Severance Motions........................................................ 871
 1. Motion to Sever the Trials of Nicholas and Barbara Bissell ............. 872
 2. Motion by Barbara Bissell to Sever Counts 12–16 and 23–33 from the Remainder of the Second Superseding Indictment..................... 874
 3. Motion by Nicholas Bissell to Sever Counts 1–11 and 20–21 From the Remainder of the Second Superseding Indictment.................... 874
 G. Motions Relating to Seized Currency....................................... 875
 1. Motion by Barbara Bissell for Return of Seized Currency ............... 875
 2. Motion by Nicholas Bissell for an In Limine Hearing to Determine Admissibility of Seized Currency.................................... 876
 H. Motion to Dismiss the Second Superseding Indictment Due to Misuse of Grand Jury ........................................................... 877
 I. Motion to Require Law Enforcement Officers to Preserve Rough Notes of Investigation and Relevant Matters ...................................... 878
 J. Motion by Barbara Bissell to Bar Introduction of Co–Conspirator Statements Pursuant to Rule 801(d)(2)(E) ....................................... 878
 K. Motion to Require the Government to Indicate Any Evidence it Intends to Introduce at Trial Pursuant to Rule 404(b) ............................... 879
 L. Motion by Barbara Bissell to Require the Government to Identify any Matters of Which it Will Seek to Have the Court Take Judicial Notice and to Produce Charts or Summaries it Intends to Use at Trial ................ 880
 M. Motion to Exclude or Redact Bruton Material ............................. 880

Pre-trial Conclusion ............................................................ 880

Sentencing ..................................................................... 880

 A. Sentencing Guideline Calculation ......................................... 880
 1. Background ........................................................ 880
 2. The Sentencing Hearing ............................................ 882
 3. Sentencing Recommendations ....................................... 882
 a. Convictions and Grouping Rules ................................. 882
 b. Group One—Mail Fraud Involving the Bedminster Station (Counts 12–16) ...................................................... 883
 c. Group Two—Tax Fraud (Counts 23–30) .......................... 883
 d. Multiple Count Adjustment ..................................... 883
 B. Objections .............................................................. 883
 1. Government Objection .............................................. 883
 2. Barbara Bissell's Objections ......................................... 885
 a. Tax Loss Calculations........................................... 885
 b. Loss from the Bedminster Station Fraud .......................... 886
 c. Minor Role in Tax Evasion and Bedminster Station fraud............ 888
 d. Sophisticated Means ........................................... 888
 e. Acceptance of Responsibility .................................... 889
 f. Remaining Objections .......................................... 889
 C. The Motion for Downward Departure ...................................... 889
 1. The Standard for Departure from the Guidelines ....................... 889
 2. Grounds For Downward Departure ................................... 891
 a. Section 5K2.0 ................................................. 892
 1. Extraordinary Family Responsibilities ................................ 892
 2. Reliance on Professionals ........................................... 895

850

 3. Susceptibility to Abuse in Prison ........................................ 896
 b. Coercion, Duress and Diminished Capacity ......................... 897
 c. Additional·Grounds for Downward Departure ...................... 898
 d. Downward Departure Conclusion ................................. 899
D. Substantial Assistance ........................................... 899
 1. Section 5K1.1 ................................................... 899
 2. The 5K1.1 Analysis ............................................. 899
 3. Barbara Bissell's Cooperation .................................... 900
E. Barbara Bissell's Sentence ........................................... 902
F. Restitution ......................................................... 902

## OPINION

**LECHNER, District Judge.**

A Grand Jury (the "Grand Jury") returned a thirty-three count indictment (the "Indictment") on 28 September 1995 against defendants Nicholas L. Bissell, Jr. ("Nicholas Bissell") and Barbara J. Bissell ("Barbara Bissell"), husband and wife (collectively, the "Defendants"). The Indictment charged perjury, 18 U.S.C. § 1623, obstruction of justice, 18 U.S.C. § 1503, mail fraud, 18 U.S.C. §§ 1341, 1346, false statements, 18 U.S.C. § 1001, conspiracy against the United States, 18 U.S.C. § 371, aiding and abetting, 18 U.S.C. § 2, obtaining a student loan by use of a false statement, 20 U.S.C. § 1097(a), attempting to evade Federal income taxes, 26 U.S.C. § 7201, wilfully subscribing to a false tax return, 26 U.S.C. § 7206(1) and wilfully assisting in the preparation of a false tax return. 26 U.S.C. § 7206(2).

The Grand Jury filed a superseding indictment (the "Superseding Indictment") on 7 March 1996, and a second superseding indictment (the "Second Superseding Indictment") on 14 March 1996. The differences among these three indictments are indicated below.[1] This opinion addresses the several pretrial motions by Defendants, a motion by the Government, as well as the sentencing of Barbara Bissell.[2]

1. References to the Indictment or Superseding Indictment by Defendants or the United States (the "Government") in their submissions have been construed as references to the Second Superseding Indictment. Unless otherwise noted, references in this opinion are to the Second Superseding Indictment. Because the Second Superseding Indictment is divided into several sections and the paragraphs are not numbered consecutively throughout, references are as follows: ¶___, at [page].

*Facts*

*The Second Superseding Indictment*

 *A. Background*

The following facts were alleged in the Second Superseding Indictment and were established at trial. Nicholas Bissell was an attorney licensed to practice law in the State of New Jersey during all relevant times. Second Superseding Indictment, ¶ 1(b), at 2. From 28 October 1982 to 28 September 1995, Nicholas Bissell served as the Prosecutor of Somerset County, New Jersey. *Id.* The Somerset County Prosecutor, who is appointed by the Governor, oversees the office of the Somerset County Prosecutor (the "Somerset County Prosecutor's Office") "the county law enforcement agency whose primary purpose [is] to protect and to serve the residents of Somerset County through the honest and fair enforcement of the criminal laws of the State of New Jersey." *Id.,* ¶ 1(a), at 1–2. Upon assuming the office of Somerset County Prosecutor, Nicholas Bissell swore to " 'faithfully, justly, and impartially execute the duties of County Prosecutor.' " *Id.,* ¶ 1(b), at 2.

Nicholas Bissell held interests in two gasoline stations. In 1981, Nicholas Bissell purchased the franchise to operate a gasoline station located at Routes 202 and 206 in Somerset County, New Jersey (the "Bedminster Station"). At that time, the Bedminster Station operated under the Citgo

References to transcripts of oral argument are cited as "[date] Tr. at ___." References to the transcripts of the trial are cited "Trial Tr. at ___."

2. This opinion does not address the sentencing of Nicholas Bissell because of his death on 25 November 1996. Motions filed by Nicholas Bissell are addressed because of their impact on the trial of Defendants.

and Mobil trademark names; it began operating under the Amoco brand in 1992. Second Superseding Indictment, ¶ 1(c)(1), at 2. Nicholas Bissell held an interest in another gasoline station, located at 1830 Easton Avenue, in Somerset County, New Jersey (the "Somerset Station"). Nicholas Bissell "and others" acquired the franchise to operate the Somerset Station in 1984 and sold the franchise in July 1988. "Proceeds from the sale of the franchise continued to be paid until approximately September, 1992." *Id.,* ¶ 1(c)(2), at 2.

From 1983 [3] to 1991, Nicholas Bissell "and a partner, who was an attorney, owned the Bedminster [S]tation." [4] During that time, Nicholas Bissell maintained a one-half interest in this partnership (the "Bedminster Station Partnership"). Second Superseding Indictment, ¶ 1(d), at 2–3. According to the Bedminster Station Partnership's tax returns, Barbara Bissell was also a partner. *Id.* Beginning in 1991, Budco, Inc. ("Budco"), d/b/a Bissell's, Inc. ("Bissell's, Inc."), owned the franchise to operate the Bedminster Station. *Id.,* ¶ 1(e), at 3. At times, Barbara Bissell served as the president of the corporation. *Id.* Nicholas Bissell was a partner in RB & W (the "RB & W Partnership"), which owned a building located at 21 North Bridge Street, in Somerville, New Jersey. *Id.,* ¶ 1(f), at 3.

### B. . *Counts 1–11: Violation of the Public Trust*

Counts One through Eleven of the Second Superseding Indictment charged Nicholas Bissell. These counts alleged violations of 18 U.S.C. §§ 1341 and 1346, which proscribe mail fraud, and 18 U.S.C. § 2, which provides one who aids and abets is liable as a principal. These counts alleged Nicholas Bissell "knowingly and wilfully did devise and intend to devise a scheme to defraud the citizens of the County of Somerset, the County of Somerset itself, and the State of New Jersey, of

their right to the honest and faithful services of their chief law enforcement officer," from 18 November 1988 through 28 September 1995, the date the Indictment was filed, thereby violating 18 U.S.C. § 1341. Second Superseding Indictment, ¶ 3, at 5. Section 1341 of Title 18 proscribes mailing, or causing the mailing of, any matter in furtherance of "any scheme or artifice to defraud...." 18 U.S.C. § 1341. A "scheme or artifice to defraud," *id.,* includes a "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

Nicholas Bissell, as the Somerset County Prosecutor, had several duties arising under New Jersey law and under the New Jersey Rules of Professional Conduct. A county prosecutor in the State of New Jersey must " 'use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws.' " *Id.* at ¶ 2(a), at 3 (citing N.J.S.A. § 2A:158–1 and quoting N.J.S.A. § 2A:158–5). A county prosecutor must also " 'devote his [or her] entire time to the duties of his [or her] office' " and cannot otherwise engage in the practice of law or any other employment. *Id.,* ¶ 2(b), at 3 (quoting N.J.S.A. § 2A:158–1.1). A county prosecutor must "refrain from willfully engaging in misfeasance and nonfeasance of his [or her] official duties," *id.,* ¶ 2(c), at 4 (citing N.J.S.A. § 2C:30–2) (official misconduct), must abide by the New Jersey Rules of Professional Conduct and must avoid conflicts of interest. *Id.,* ¶ 2(d), at 4.

A local government officer in the State of New Jersey cannot have " 'an interest in a ... business, transaction, or professional activity, which is in substantial conflict with the proper discharge of his [or her] duties in the public interest.' " Second Superseding Indictment, ¶ 2(e)(1), at 4 (quoting N.J.S.A. § 40A:9–22.5(a)). A local government officer must "refrain from using or attempting to use 'his [or her] official position to secure

---

**3.** This date was substituted in the Second Superseding Indictment and the Superseding Indictment for 1982, the date set out in the Indictment. *Cf.* Indictment, ¶ 1(d), at 2; Superseding Indictment, ¶ 1(d), at 2.

**4.** This language was substituted in the Second Superseding Indictment and the Superseding Indictment for the language of the Indictment, which read "Bissell & Welaj was a partnership that owned the franchise to operate the Bedminster [S]tation." Indictment, ¶ 1(d), at 2–3; *cf.* Superseding Indictment, ¶ 1(d), at 2–3.

unwarranted privileges or advantages for himself [or herself] or others.'" *Id.,* ¶ 2(e)(2), at 4 (quoting N.J.S.A. § 40A:9–22.5(c)). Such an officer cannot act in his or her official capacity "'in any matter where he [or she], a member of his [or her] immediate family, or a business organization in which he [or she] has an interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his [or her] objectivity or independence of judgment.'" *Id.,* ¶ 2(e)(3), at 4 (quoting N.J.S.A. § 40A:9–22.5(d)). A local government officer must "'fully, truthfully and accurately disclose all material facts relating to his [or her] compliance with the Code of Ethics for Local Government Officers.'" *Id.,* ¶ 2(e)(6), at 5 (quoting N.J.S.A. § 40A:9–22.6). Such an officer may neither engage in conduct "'which might reasonably be expected to prejudice his [or her] independence of judgment in the exercise of his [or her] official duties,'" nor use his or her public office to secure financial gain for him or herself, a member of his or her immediate family "'or any business organization with which he [or she] is associated.'" *Id.,* ¶¶ 2(e)(4), (5), at 5 (quoting N.J.S.A. § 40A:9–22.5(e), (g)).

The Second Superseding Indictment alleged Nicholas Bissell failed to disclose a "material conflict of interest" that resulted from a business relationship between himself and an attorney who represented adversaries of the Somerset County Prosecutor's Office. Second Superseding Indictment, ¶ 4(a), at 5–6. It was charged that Nicholas Bissell also abused his position as Somerset County Prosecutor to commit extortion in connection with the Bedminster and Somerset Stations. *Id.,* ¶ 4(b), at 6. The Government alleged Nicholas Bissell engaged in conduct "which might reasonably be expected to compromise his ability to faithfully, justly and impartially execute" his official duties, *id.,* ¶ 4(c), at 6, and failed "to act honestly" in connection with a Federal civil rights lawsuit (the "Federal Civil Action") that named him as a defendant. *Id.,* ¶ 4(d), at 6.

### 1. *Failure to Disclose Business Relationship With Adversary*

Nicholas Bissell created a conflict of interest by forming the RB & W Partnership, on 28 October 1982, with an attorney (his "Partner" or "Nicholas Bissell's Partner"). Nicholas Bissell's Partner represented clients in an adversarial capacity to the Somerset County Prosecutor's Office. *Id.* at ¶ 5, at 6. In "September and October 1983," Nicholas Bissell formed the Bedminster Station Partnership with his Partner. *Id.,* ¶ 6, at 6. The Bedminster Station Partnership created another conflict of interest. *Id.,* ¶ 6, at 7. Nicholas Bissell "created and used a false document" that inaccurately indicated the Bedminster Station Partnership was formed before he became Somerset County Prosecutor; he engaged in additional sham transfers and continued to maintain control of, and interests in, the Bedminster Station and RB & W Partnerships. *Id.,* ¶¶ 7–8, at 7.

### 2. *Extortion by Abuse of Office*

An individual (the "Distributor Owner") owned the franchisor/gasoline distribution company (the "Distributor") which, in turn, owned the Somerset and Bedminster Stations. Second Superseding Indictment, ¶ 10(a), at 7. From January 1988 through March 1988, the Distributor Owner received complaints from customers about the Somerset and Bedminster Stations. Thereafter, the Distributor Owner notified Nicholas Bissell the complaints could result in the termination of the stations' franchise agreements. *Id.,* ¶ 10(b), at 8. On 14 March 1988, Nicholas Bissell threatened to plant cocaine in the Distributor Owner's car and then have him arrested and prosecuted by the Somerset County Prosecutor's Office. "This threat was a factor, and continued to be a factor, in the Distributor Owner's business dealings with [Nicholas Bissell]." *Id.,* ¶ 10(c), at 8.

### 3. *Conduct Which Compromised the Office of the Somerset County Prosecutor; Failure to Act Honestly in the Conduct of Nicholas Bissell's Office*

Nicholas Bissell engaged in other unlawful conduct that compromised his ability to honestly execute his duties as Somerset County Prosecutor, "thereby depriving the public of their right to the honest ... services of their chief law enforcement officer." *Id.* at ¶ 11, at

8. Nicholas Bissell engaged in the "fraudulent operation" of the Bedminster Station, which is the subject of counts 12–16 and 18 of the Second Superseding Indictment, the "fraudulent operation" of the Somerset Station, also the subject of count 17 and the "criminal solicitation of a vendor of the Prosecutor's Office to prepare fraudulent tax returns," also the subject of count 19. *Id.* at ¶ 11, at 8–9. Nicholas Bissell obstructed justice and committed perjury in connection with the Federal Civil Action, which is also the subject of counts 20–21. *Id.,* ¶ 12, at 9. "It was further a part of the scheme that [Nicholas Bissell] took steps to conceal his dishonest conduct and self-dealing thus denying the public their right to the honest, faithful and disinterested services of their prosecutor and chief law enforcement officer." *Id.,* ¶ 13, at 9.

### 4. Mailings in Furtherance of Unlawful Behavior

Nicholas Bissell knowingly and wilfully mailed or directed eleven separate mailings, all in violation of 18 U.S.C. §§ 2, 1341 and 1346. Counts one, two, seven, nine and eleven charged the mailing of "Nicholas L. Bissell's Local Government Ethics Law, Financial Disclosure Statement, addressed to Department of Community Affairs, Trenton, New Jersey," on 3 October 1991, 28 April 1992, 4 May 1993, 28 April 1994 and 21 April 1995. Count three charged a mailing, on 26 October 1992, of Nicholas Bissell's "Answers to Plaintiff's First Set of Interrogatories" in the Federal Civil Action. Count six charged a mailing, on 15 January 1993, of Nicholas Bissell's "Second Request for Production of Documents" again in the Federal Civil Action. Count four charges a mailing, on 18 December 1992, of "Financial aid forms ... to 1301 Route 28, Somerville, New Jersey." Counts five, eight and ten charged the mailing of "Financial aid forms, ... to Catholic University, Washington, D.C.," on 24 December 1992, 3 June 1993 and 3 June 1994. Second Superseding Indictment, ¶ 14, at 10–11. Each mailing formed the basis for one count in the Second Superseding Indictment for mail fraud, pursuant to 18 U.S.C.

§ 1341.[5] Counts one through eleven also charged criminal liability as a principal for aiding and abetting the commission of mail fraud. 18 U.S.C. § 2.

### C. Counts 12–16: Defrauding An Investor in the Bedminster Station

Counts 12–16 of the Second Superseding Indictment charged Defendants mailed documents in connection with defrauding Thomas "Buddy" Thornburg ("Thornburg"), an investor in the Bedminster Station, thereby committing (and aiding and abetting) mail fraud. 18 U.S.C. §§ 2 and 1341. Barbara Bissell, the bookkeeper for the Bedminster Station, maintained checkbook and payroll records and signed partnership and corporate income tax returns. Second Superseding Indictment, ¶ 2, at 12. Thornburg, the brother of an employee in the Office of the Somerset County Prosecutor, invested $100,000 in the Bedminster Station in June 1989. In return, Thornburg was to be an equal partner in the Bedminster Station Partnership and was employed as the manager of the Bedminster Station. *Id.,* ¶ 3, at 12.

Counts 12–16 charged Defendants "knowingly and willfully devised a scheme and artifice to defraud [Thornburg] of money and property by means of false and fraudulent pretenses, representations and promises," from June 1989 to April 1995, "by diverting, embezzling and stealing money from the Bedminster [S]tation." Second Superseding Indictment, ¶¶ 4–5, at 12. To further the scheme, Nicholas Bissell solicited $100,000 from Thornburg in June 1989, and on a later occasion, solicited an additional $23,000 from him. *Id.,* ¶¶ 6–7, at 13. In addition, Nicholas Bissell falsely represented to Thornburg, on "a number of occasions" between January 1990 and January 1995 that the Bedminster Station was operating at a loss. *Id.,* ¶ 7, at 12.

Barbara Bissell used funds from the Bedminster Station for personal expenses, including payments for 1988 Mercedes Benz, 1992 Acura Legend LS and 1995 Jeep Grand

---

**5.** The predicate "scheme or artifice to defraud" under 18 U.S.C. § 1341 is the deprivation "of the

intangible right of honest services." 18 U.S.C. § 1346.

Cherokee automobiles,[6] and a cellular telephone. She used a credit card held in the name of the Bedminster Station to pay other personal expenses. Thornburg was not told of any of these payments. *Id.,* ¶ 8, at 8.

The Second Superseding Indictment also charged Defendants "routinely embezzled cash from the Bedminster [S]tation" without informing Thornburg, including approximately $33,993 in 1994, $58,794 in 1993, $39,895 in 1992 and $13,800 in 1991, for a four-year total of $146,482.[7] Second Superseding Indictment, ¶ 9, at 13.

Count twelve charged Defendants mailed payments, beginning at $588 per month, for a 1988 Mercedes Benz automobile leased to Nicholas Bissell. Such payments, made by Bissell's, Inc., were mailed from approximately 2 January 1990 to 20 June 1991 and 25 August 1991 to 20 April 1992.[8] Second Superseding Indictment, ¶ 11, at 14. Count thirteen charged Defendants mailed monthly payments of approximately $600, for a 1992 Acura Legend and a 1995 Jeep Grand Cherokee. These payments, made by Bissell's, Inc., were mailed from approximately 31 July 1992 to 25 August 1994 and 25 October 1994 to 15 March 1995.[9] *Id.*

Count fourteen charged Defendants mailed a Federal corporate income tax return for Budco to the Internal Revenue Service ("IRS") in Holtsville, New York, from a United States Post Office in Skillman, New Jersey, on 13 September 1993. *Id.* Count fifteen charged Defendants mailed monthly payments for a cellular telephone registered in the name of Nicholas Bissell. Such payments, made by Bissell's, Inc., were mailed from approximately 27 December 1991 to 25 November 1993. *Id.* Count sixteen charged

that from approximately 2 February 1991 to 31 December 1991, Defendants mailed eight payments by Bissell's, Inc. to American Express. *Id.,* ¶ 11. Each of the mailings forms the basis for one count of mail fraud. 18 U.S.C. § 1341.

### D. *Count 17: Fraud on the Investors in the Somerset Station*

Count 17 of the Second Superseding Indictment charged Nicholas Bissell mailed documents in connection with defrauding Richard Thornburg ("Richard Thornburg") and Robert Lang ("Lang"), thereby committing (and aiding and abetting) mail fraud. 18 U.S.C. §§ 2 and 1341. Richard Thornburg and Lang were both employees of the Somerset County Prosecutors Office and investors in the Somerset Station. Second Superseding Indictment, ¶¶ 2–3, at 15. Lang invested $20,000 in the Somerset Station in 1984; at that time, Nicholas Bissell "was managing the finances of the Somerset [S]tation on behalf of himself and his father." *Id.,* ¶¶ 2, 4, at 15. Count 17 also charged Nicholas Bissell "knowingly and willfully devised a scheme and artifice to defraud [Richard Thornburg and Lang] of money and property by means of false and fraudulent pretenses, representations and promises," from October 1984 to June 1993,[10] by "diverting, embezzling and stealing money from [Richard Thornburg and Lang]." *Id.,* ¶¶ 5–6, at 15. To further the scheme to defraud Lang and Richard Thornburg, Nicholas Bissell solicited $20,000 from Lang and $25,000 from Richard Thornburg. *Id.,* ¶ 7, at 16. In addition, Nicholas Bissell falsely represented to Richard Thornburg and Lang, between October

---

**6.** Payments relating to the Jeep Cherokee were not alleged in the Indictment; they were first alleged in the Superseding Indictment.

**7.** According to the Indictment, the amounts were $43,497, $79,680, $80,641 and $42,218, respectively, for a total of $246,036. Indictment, ¶ 9, at 12. According to the Superseding Indictment, the amounts were $43,497, $77,080, $57,248 and $26,618, respectively, for a total of $204,443. Superseding Indictment, ¶ 9, at 13.

**8.** These were the same dates as alleged in the Superseding Indictment. The dates alleged in

the Indictment were June 1989 to 30 April 1992. Indictment, ¶ 11, at 13.

**9.** These were the same dates as alleged in the Superseding Indictment. The dates alleged in the Indictment were 31 July 1992 to 21 December 1994.

**10.** June 1993 was substituted in the Second Superseding Indictment and the Superseding Indictment for 28 September 1995, which was the date alleged in the Indictment. Indictment, ¶ 5, at 14; Superseding Indictment, ¶ 5, at 15.

1984 and July 1988,[11] that the Somerset Station was operating at a loss. *Id.*, ¶ 8, at 16. Based upon those representations, Thornburg and Lang invested additional funds in the Somerset Station. *Id.* Notwithstanding these representations to Lang and Richard Thornburg concerning the financial condition of the Somerset Station, Nicholas Bissell represented to prospective buyers, from October 1984 to July 1988, that the Somerset Station had a positive net income of $27,483 in 1984, $52,085 in 1985 and $60,397 in 1986. *Id.*, ¶ 9, at 16. To further the scheme to defraud Richard Thornburg and Lang, Nicholas Bissell also paid personal expenses with funds from the Somerset Station, including payments for a 1988 Mercedes Benz automobile, without their knowledge or consent.[12] *Id.*, ¶ 10, at 16.

The Second Superseding Indictment also charged Nicholas Bissell "represented ... that the Somerset [S]tation was operated such that if there were any profits or losses from its sale, those profits or losses would be divided equally among [Richard Thornburg and Lang] and [Nicholas Bissell] and his father." *Id.*, ¶ 11, at 16. The Somerset Station was sold at Nicholas Bissell's direction in July 1988; the buyers gave the sellers a note (the "Note"), the terms of which included monthly payments for five years. *Id.*, ¶ 12, at 16–17. Richard Thornburg and Lang received payments pursuant to the Note but the Note was accelerated between 15 and 22 September 1992, and a lump sum payment of $12,923 was paid to Nicholas Bissell's father; Richard Thornburg and Lang, who were unaware of the lump sum payment pursuant to the Note, did not receive any of the proceeds of this payment. *Id.*, ¶¶ 12–13, at 17.

To further the scheme to defraud Richard Thornburg and Lang, Nicholas Bissell know-

ingly and wilfully mailed or caused the mailing of a check for $12,923.87 to his father in Florida, thereby violating 18 U.S.C. §§ 2 and 1341. *Id.*, ¶ 14, at 17.

### E. Count 18: Fraud on the Distributor

Count 18 of the Second Superseding Indictment charged Nicholas Bissell submitted false coupons and photocopies of business records to the Distributor that overstated the gross sales of the Bedminster Station. This was done in order to receive a rebate for which the Bedminster Station was not entitled, in violation of 18 U.S.C. § 1341. Second Superseding Indictment, ¶¶ 1–8, at 18–19. The scheme to defraud the Distributor took place from September 1992 [13] to December 1993; *id.*, ¶ 3, at 18; the relevant mailing allegedly took place on 1 November 1993. *Id.*, ¶ 8, at 19. As part of the scheme to defraud the Distributor, Nicholas Bissell submitted to the Distributor, in October 1992,[14] false coupons to overstate sales by the Bedminster Station in September 1992. *Id.*, ¶ 5, at 18. Nicholas Bissell submitted to the Distributor, in December 1992, false coupons overstating sales by the Bedminster Station, in November 1992.[15] *Id.*, ¶ 6, at 18–19. Nicholas Bissell submitted to the Distributor in November 1993, false coupons overstating sales by the Bedminster Station in October 1993.[16] *Id.*, ¶ 7, at 19. To further the scheme to defraud the Distributor, Nicholas Bissell knowingly and wilfully mailed or caused the mailing of photocopies of business records of the Bedminster Station to the Distributor, on 1 November 1992.[17] *Id.*, ¶ 8, at 19.

### F. Count 19: Financial Aid Fraud

Count 19 of the Second Superseding Indictment charged Nicholas Bissell submitted

---

11. July 1988 was substituted in the Second Superseding Indictment and the Superseding Indictment for October 1992, which was the date alleged in the Indictment. Indictment, ¶ 8, at 15; Superseding Indictment, ¶ 8, at 16.

12. Neither the Indictment nor the Superseding Indictment contained this allegation.

13. The Indictment alleged October 1993 as the relevant date. Indictment, ¶ 3, at 17.

14. The Indictment alleged October 1993 as the relevant date. Indictment, ¶ 3, at 17.

15. The Indictment did not contain this allegation.

16. The Indictment did not contain this allegation.

17. The Indictment alleged 9 December 1993 as the relevant date. Indictment, ¶ 6, at 17.

false information to obtain financial aid for his son's education at Catholic University. The United States Department of Education approved Catholic University for participation in Federal student financial aid programs. Second Superseding Indictment, ¶ 3, at 20. On 24 December 1992, Nicholas Bissell "aid[ed] and abet[ted] the submission of false and fraudulent financial information to Catholic University," by soliciting a vendor for the Somerset County Prosecutor's Office to prepare fraudulent tax returns and thereby obtain financial aid for his son pursuant to the Federal student financial assistance program. *Id.*, ¶ 4, at 20. The Second Superseding Indictment charged the acts, which occurred between 24 December 1992 and 5 April 1995, violated 18 U.S.C. § 2 and 20 U.S.C. § 1097(a). *Id.*, ¶ 5, at 20–21.

### G. *Count 20: Obstruction of Justice*

Count 20 of the Second Superseding Indictment charged Nicholas Bissell destroyed a police report related to the Federal Civil Action in which he was a defendant. A Federal complaint was filed on 8 May 1992 in the District of New Jersey, alleging civil rights violations in connection with the May 1990 arrest of James J. Giuffre ("Giuffre") on narcotics charges. Second Superseding Indictment, ¶ 2, at 22. Giuffre alleged Nicholas Bissell and others denied him his Sixth Amendment right to counsel and coerced him into forfeiting two parcels of land.

It was charged that in July 1992, a Warren Township Police Officer produced a handwritten police report (the "Police Report") that contained references to Giuffre's arrest, including Giuffre's requests for counsel. *Id.*, ¶¶ 3–4, at 22. The Police Report was forwarded to Nicholas Bissell, who ordered it rewritten to exclude the references to requests by Giuffre for counsel. The Warren Township Police Officer subsequently prepared a different, typewritten report on 27 July 1992. *Id.*, ¶¶ 5–6, at 22–23. The Second Superseding Indictment also charged Nicholas Bissell failed to provide a copy of the Police Report or to disclose its existence

during pretrial discovery, between 19 June 1992 and 15 January 1993,[18] in the Federal Civil Action. Nicholas Bissell was charged with violating 18 U.S.C. §§ 2 and 1503, which proscribe aiding and abetting and obstruction of justice for acts occurring between 8 May 1992 and 28 September 1995. *Id.*, ¶¶ 7–8, at 23.

### H. *Count 21: Perjury During the Federal Civil Action*

Count 21 of the Second Superseding Indictment, which charged Nicholas Bissell, also concerned the Federal Civil Action. Count 21 charged that, when Giuffre forfeited two parcels of land to the Somerset County Prosecutor's Office, those parcels had a combined assessed value of approximately $111,900. In the Federal Civil Action, Giuffre alleged these parcels of land were resold below fair market value to buyers with connections to the Office of the Somerset County Prosecutor. Second Superseding Indictment, ¶ 2, at 24. Nicholas Bissell appeared at a deposition on 23 April 1993 as a witness under oath in the Federal Civil Action. At that time, Nicholas Bissell stated he had relied upon a valid appraisal that Giuffre's forfeited property "wasn't worth all that much money." *Id.*, ¶ 4, at 25. Nicholas Bissell did not, however, obtain a copy of such an appraisal until after Giuffre filed the Federal Civil Action. *Id.*, ¶¶ 3–5, at 24–26. Accordingly, Bissell's 23 April 1993 testimony was charged to be, and was in fact, false, in violation of 18 U.S.C. § 1623. *Id.*, ¶¶ 5, at 26.

### I. *Count 22: False Statements to Federal Agents*

Count 22 of the Second Superseding Indictment charged Nicholas Bissell. Federal Agents (the "Federal Agents") searched the home of Defendants on 19 April 1995, in connection with an investigation leading to the Indictment. Nicholas Bissell was present during that search and "[i]n excess of $9,000 in cash was discovered in ... the home." Second Superseding Indictment,

---

**18.** According to the Indictment, the relevant time frame is from 15 January to 11 August 1993.

Indictment, ¶ 7, at 22.

¶¶ 2–3, at 27. Thereafter, Nicholas Bissell demanded to meet with Federal authorities; meetings took place on 19, 21 and 26 April 1995. At the outset of each of these meetings, Nicholas Bissell was informed he was the target of a grand jury investigation. Nevertheless, he waived his right to counsel and signed an appropriate waiver. *Id.*, ¶¶ 5–6, at 27.

The Second Superseding Indictment charged Nicholas Bissell stated during each of these meetings that the Bedminster Station had not been profitable since he purchased it, denied taking cash from the Bedminster Station and stated the Bedminster Station owed him money. "These statements were designed to mislead and impair a [F]ederal investigation. . . ." *Id.*, ¶ 7, at 28. At the time he made these statements, Nicholas Bissell was aware that he had taken cash from the Bedminster Station. Accordingly, Nicholas Bissell was charged with violating 18 U.S.C. § 1001.

### J. *Count 23: Conspiracy to Defraud the IRS*

Count 23 of the Second Superseding Indictment charged that, from 1 January 1991 to 28 September 1995, Defendants conspired to evade payment of Federal income taxes. To that end, they diverted cash from, and issued checks drawn on, the business account of the Bedminster Station, for personal expenses. Second Superseding Indictment, ¶¶ 2–4, at 29. Defendants failed to report approximately $146,482 [19] of income and failed to disclose accurate amounts of income or loss to the accountant who prepared income tax returns for the Bedminster Station, for the 1991–93 tax years. *Id.*, ¶ 5, at 29. As part of the conspiracy, Defendants failed to disclose personal income to the accountant who prepared their personal Federal income tax returns for the 1991–93 tax years. *Id.*, ¶ 6, at 30.

As part of the conspiracy to defraud the IRS, Defendants "did not disclose their true ownership interests in the Bedminster [S]tation to their accountant" and thereby wrongfully obtained the benefit of tax losses during the 1991–92 tax years. Second Superseding Indictment, ¶ 7, at 30. Defendants were also charged with paying employees of the Bedminster Station in cash, "off the books," without accurate payroll records and without remitting the appropriate amount of income taxes for work these employees performed. *Id.*, ¶ 8, at 30. "It was further a part of the conspiracy that [Defendants], by engaging in the activities described [above], thereby prevented the proper ascertainment and computation by the [IRS] of the amount of tax due and owing" on personal [20] tax returns for the 1991–94 tax years, and on business tax returns for the 1991–93 tax years. *Id.*, ¶¶ 9–10, at 30–31. Defendants were also charged with diverting cash from the Bedminster Station through February 1995 as part of the conspiracy to defraud the IRS and of taking steps to conceal the existence of this conspiracy. The Second Superseding Indictment charged seven overt acts, each the filing of a Federal income tax return with the IRS, as part of the conspiracy. Two additional overt acts charged concern the taking of cash from the Bedminster Station's cash register.

### K. *Counts 24–27: Evasion of Personal Income Taxes*

Counts 24 through 27 of the Second Superseding Indictment charged Defendants evaded Federal personal income taxes for the tax years 1991–94, in violation of 26 U.S.C. § 7201. Second Superseding Indictment, ¶¶ 1–3, at 32–33. Defendants failed to report $13,800 in diverted income received in 1991, $39,895 received in 1992, $58,794 received in 1993 and $33,993 received in 1994, for a total of $146,482 in personal unreported income.[21] *Id.*, ¶ 2, at 33.

19. In the Indictment, the relevant amount alleged was $246,036, Indictment, ¶ 5, at 29; the relevant amount alleged in the Superseding Indictment was $204,443. Superseding Indictment, ¶ 5, at 29.

20. Neither the Indictment nor the Superseding Indictment contained this allegation, concerning the personal income tax returns of Defendants.

21. The relevant amounts alleged in the Indictment were $42,218, $80,641, $79,680, $43,497 and $246,036, respectively. Indictment, ¶ 2, at 31. The relevant amounts alleged in the Su-

### L. Counts 28–30: Subscribing to False Returns

Counts 28 through 30 of the Second Superseding Indictment charged Barbara Bissell subscribed to three Federal income tax returns under penalty of perjury "which she did not believe to be true and correct as to every material matter." Second Superseding Indictment, ¶ 2, at 35. Barbara Bissell failed to report $202,539 in gross receipts from the Bedminster Station, "failed to disclose the true ownership interest of the respective principals, and failed to provide an accurate statement of profit or loss incurred in the tax year," in violation of 26 U.S.C. § 7206(1). Id., ¶¶ 3–4, at 35–36.

Count 28 concerned a 1991 Form 1065 Bedminster Station Partnership return, which Barbara Bissell signed on 8 April 1992.[22] Count 29 concerned a 1992 Form 1120S Budco, Inc. corporate return, which Barbara Bissell signed on 13 September 1993. Count 30 concerns a 1993 Form 1120S Budco, Inc. corporate return, which Barbara Bissell signed on 14 September 1994. Second Superseding Indictment, ¶ 4, at 36.

### M. Counts 31–33: Aiding and Assisting in the Filing of a False Return

Counts 31 through 33 of the Second Superseding Indictment charged Nicholas Bissell "knowingly and willfully aided and assisted in" preparation of the income tax returns that was the subject of counts 28–30. Second Superseding Indictment, ¶ 2, at 37.

### Discussion

### A. A Summary of the Motions [23]

Pretrial motions of Defendants were defined in the submissions as the "Omnibus Motions." Omnibus Motions filed by Nicholas Bissell sought (1) to dismiss counts 1–11 from the Second Superseding Indictment, pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure (the "Rules"), (2) to suppress video surveillance film taken in the Bedminster Station between 4 and 19 February 1995 (the "Videotapes"), pursuant to Rules 12(b)(3) and 41(f), (3) to bar the Government from introducing pretrial statements made by Barbara Bissell that implicated Nicholas Bissell, or, in the alternative, to redact certain material, pursuant to Rule 12(b)(3) and Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("Bruton"), (4) to require production of an unredacted copy of an affidavit of IRS Special Agent Joseph LaRose, which was filed in support of an application for a search warrant of Defendants' home, dated 15 April 1995 ("LaRose 15 April 1995 Affidavit"), pursuant to Rules 16 and 41, (5) to compel the Government to make pretrial disclosure of exculpatory material, pursuant to Rule 16, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("Brady"); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("Giglio") and material falling within the scope of the Jencks Act, 18 U.S.C. § 3500 (the "Jencks Act"), (6) to sever counts 1–11 and counts 20–21 from the balance of the Second Superseding Indictment, pursuant to Rules 8(b), 12(b)(5) and 14, (7) to schedule an in limine hearing to determine whether currency seized from Defendants' home (the "Currency") is admissible against Nicholas Bissell, and (8) to permit Nicholas Bissell to join in pretrial motions of Barbara Bissell, where he had standing and where the relief sought applied to him.[24]

perseding Indictment were $26,68, $57,248, $77,080, $43,497 and $204,443, respectively. Superseding Indictment, ¶ 2, at 32.

**22.** The Second Superseding Indictment identifies the filing as the "1991 Bissell & Welaj Partnership Return, 1065." Second Superseding Indictment at 36.

**23.** As stated on the record on 11 March 1996, all pretrial motions filed by Defendants were considered as to the Second Superseding Indictment. 11 Mar. 1996 Tr. at 4.

**24.** Nicholas Bissell submitted: Brief on Behalf of Defendant Nicholas L. Bissell, Jr. in Support of Omnibus Motion (the "First Nicholas Bissell Moving Brief"); Certification of Donald L. Belsole, Esq., dated 6 December 1995, attaching page 24, LaRose 15 April 1995 Affidavit; Reply Brief in Support of the Omnibus Motions by Defendant, Nicholas L. Bissell, Jr. (the "First Nicholas Bissell Reply Brief"); Chronology on Behalf of Defendant Nicholas L. Bissell, Jr.; a letter brief, dated 11 March 1996 (the "11 March 1996 Letter Brief"); a letter brief, dated 12 March 1996.

. Omnibus Motions filed by Barbara Bissell sought (1) to sever the trials of Defendants, or, in the alternative, to sever counts 12–16 and counts 23–33 from counts 1–11 and counts 17–22 of the Second Superseding Indictment because of asserted prejudicial joinder, (2) to compel the Government to make pretrial disclosure of material pursuant to Rule 16, *Brady, Giglio* and the Jencks Act, (3) to require all Federal, state, county and local law enforcement officers to retain and preserve all rough notes and writings concerning investigation related to the Second Superseding Indictment, (4) to schedule an *in limine* hearing to determine the admissibility of statements, pursuant to Rules 104(a) and 801(d)(2)(E) of the Federal Rules of Evidence ("Rule 104(a)"); ("Rule 801(d)(2)(E)"), (5) to compel the Government to disclose evidence it intended to introduce at trial that was within the scope of Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)"), (6) to require the Government to identify any matters of which it sought to have the court take judicial notice and to produce the charts or summaries the Government intended to use at trial, (7) to require the Government to return to Barbara Bissell the Currency (the "Motion for Return of Currency"), and (8) to permit Barbara Bissell to join in pretrial motions of Nicholas Bissell, where she had standing and where the relief sought applied to her.[25] Oral argument on the Omnibus Motions was held 4 March 1996; further argument was held 11 March 1996 concerning the admissibility of the Videotapes.

The Government filed a motion, pursuant to Rule 16, for reciprocal discovery and for a protective order.[26] Nicholas Bissell filed a motion to dismiss the Second Superseding Indictment on ground that the Government improperly used the Grand Jury to obtain additional evidence; Barbara Bissell joined in that motion (the "Grand Jury Motion").[27] The Government filed another motion, seeking an order requiring Nicholas Bissell to post an additional bond of at least $50,000, to require him to report to Pretrial Services on a weekly basis and to require him to cease all contact with Government witnesses (the "Motion for Modification of the Conditions of Release").[28] By order, dated 1 March 1996,

The Government submitted: Memorandum of Law of the United States in Opposition to Defendants' Omnibus Motions and in Support of Its Cross–Motion for Reciprocal Discovery and a Protective Order (the "Opposition Brief") attaching exhibits; an Affidavit of Perry Carbone, Assistant United States Attorney, dated 4 January 1996 (the "4 January 1996 Carbone Affidavit") attaching exhibits; a letter brief, dated 5 March 1996, attaching *United States v. Grandmaison,* 77 F.3d 555 (1st Cir.1996); photographs of the Bedminster Station, submitted 11 March 1996 (the "Photographs").

**25.** Barbara Bissell submitted: Brief on Behalf of Defendant Barbara Bissell in Support of Her Omnibus Motions (the "Barbara Bissell Moving Brief"); Letter Memorandum of Law in Lieu of Reply Brief (the "Barbara Bissell Reply Brief"); a letter brief supplementing prior submissions, dated 29 February 1996.

The Opposition Brief and the 4 January 1996 Carbone Affidavit also addressed the Omnibus Motions of Barbara Bissell.

**26.** The Government submitted: Notice of Motion to Compel and for a Protective Order (the "First Government Notice of Motion"); the Opposition Brief; the 4 January 1996 Carbone Affidavit; an affidavit of Perry Carbone, Assistant United States Attorney, dated 4 January 1996, submitted under seal (the "Sealed Affidavit").

Defendants submitted: First Nicholas Bissell Moving Brief; First Nicholas Bissell Reply Brief.

**27.** In support of the Grand Jury Motion, Nicholas Bissell submitted: Brief in Support of the Motion by Defendant, Nicholas L. Bissell, Jr., for Dismissal of the Indictment (the "Second Nicholas Bissell Moving Brief"); Certification of Donald L. Belsole, Esq., dated 4 January 1996 ("Belsole Cert.") attaching exhibits; Certification of Kevin Weinman, Esq., dated 4 January 1996 ("Weinman Cert."); a letter brief in reply, dated 26 January 1996 and amended 29 January 1996; (the "26 January 1996 Letter Brief") attaching an exhibit.

Barbara Bissell filed a notice of motion, joining in the Grand Jury Motion.

In opposition to the Grand Jury Motion, the Government submitted: a letter brief in opposition, dated 12 January 1996 (the "12 January 1996 Letter Brief").

**28.** In support of the Motion for Modification of the Conditions of Release, the Government submitted: Memorandum of Law in Support of the Government's Motion to Modify the Conditions of Release of the Defendant Nicholas L. Bissell; Affidavit of Joseph LaRose, dated 7 February 1996, attaching exhibits; Affidavit of Joseph LaRose, dated 14 February 1996; Supplemental Affidavit of Joseph LaRose, dated 21 February

the Motion for Modification of the Conditions of Release was denied; Nicholas Bissell was ordered to report to Pretrial Services on a regular basis, to avoid any contact with Government witnesses and to comply fully with the order of release filed 4 October 1995.

### B. *Motion to Dismiss Counts 1–11 of the Second Superseding Indictment*

#### 1. *Background*

Nicholas Bissell sought an order dismissing counts 1–11 of the Second Superseding Indictment, which alleged violations of 18 U.S.C. §§ 1341 and 1346. Nicholas Bissell argued these counts "fail to allege a scheme that violates [18 U.S.C.] § 1341 or § 1346." First Nicholas Bissell Moving Brief at 8; *see* First Nicholas Bissell Reply Brief at 1–10; 11 March 1996 Letter Brief, *passim.* Section 1341 of Title 18, the Federal mail fraud statute, concerns "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" and proscribes mailing or attempting to mail material "for the purpose of executing such scheme or artifice or attempting to do so." 18 U.S.C. § 1341. A "scheme or artifice to defraud," *id.,* "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

■ The elements of the Federal crime of mail fraud are (1) a scheme or artifice to defraud, (2) participation by a defendant, with the specific intent to defraud, in the particular scheme charged, and (3) " 'a mailing must further the scheme to defraud or be incident to an essential part of that scheme.' " *United States v. Frey,* 42 F.3d 795, 797–98 (3d Cir.1994) (quoting *United States v. Ruuska,* 883 F.2d 262, 264 (3d Cir.1989)); *see United States v. Lane,* 474 U.S. 438, 451, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986) ("To find a violation of the mail fraud statute ... the charged 'mailings' must be 'for the purpose of executing the scheme.' ") (quoting *Kann v. United States,*

323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944)); *United States v. Kones,* 77 F.3d 66, 71 (3d Cir.) ("A person commits mail fraud when she [or he] has 'devised' or intends to 'devise' a scheme to defraud, and she [or he] uses the mails for the purposes of executing or attempting to execute the scheme."), *cert. denied,* —— U.S. ——, 117 S.Ct. 172, 136 L.Ed.2d 113 (1996); *United States v. Hannigan,* 27 F.3d 890, 892 (3d Cir.1994); *United States v. Copple,* 24 F.3d 535, 544 (3d Cir.), *cert. denied,* 513 U.S. 989, 115 S.Ct. 488, 130 L.Ed.2d 400 (1994)). Proof of loss by the alleged victims of mail fraud is unnecessary. *Copple,* 24 F.3d at 544 (citing *United States v. Kelley,* 929 F.2d 582, 585 (10th Cir.), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991)). Moreover, each mailing that is " 'incident to an essential part of the scheme' " constitutes a violation of the mail fraud statute. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406; 1413 (3d Cir.) (quoting *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

#### 2. *Standards for Dismissal of an Indictment*

■ For purposes of the Rule 12(b)(2) motion to dismiss counts 1–11, all factual allegations set out in the Second Superseding Indictment were accepted as true. *United States v. Besmajian,* 910 F.2d 1153, 1154 (3d Cir.1990) (citing *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952)); *United States v. Fauver,* 888 F.Supp. 668, 670 (M.D.Pa.1995); *United States v. Waldrop,* 786 F.Supp. 1194, 1199 (M.D.Pa.1991), *aff'd,* 983 F.2d 1054 (3d Cir.1992), *cert. denied,* 508 U.S. 950, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993). Accordingly, the issue was whether the Government had alleged a Federal crime. *Fauver,* 888 F.Supp. at 670.

1996, attaching exhibits; a letter brief in reply, dated 21 February 1996.

In opposition to the Motion for Modification of the Conditions of Release, Nicholas Bissell submitted: Memorandum of Law in Opposition to the Government's Motion to Modify the Condi-

tions of Release of Defendant, Nicholas L. Bissell, Jr.; Certification of Nicholas L. Bissell, Jr., dated 20 February 1996, attaching exhibits; Certification of Donald R. Belsole, Esq., dated 20 February 1996, attaching exhibits.

3. *Failure to Provide Honest Services*

Counts 1–11 of the Second Superseding Indictment charged a scheme by Nicholas Bissell to deprive the citizens of Somerset County of the honest services of their chief law enforcement officer. Nicholas Bissell argued such a scheme, even if true, is not a Federal crime.

Congress passed the "honest services" provision of the Federal mail fraud law, 18 U.S.C. § 1346, following the decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Prior to *McNally*, several lower court decisions endorsed the so-called "intangible rights" doctrine, which held that the Federal mail fraud statute proscribed schemes to defraud a governmental body and its citizens of the intangible right to honest and impartial government.[29]

In *McNally*, the Court considered an indictment and conviction, pursuant to 18 U.S.C. § 1341, for a patronage scheme involving kickbacks on commissions for workman's compensation insurance policies purchased by the State of Kentucky. *McNally*, 483 U.S. at 352–53, 107 S.Ct. at 2877–78. *McNally* determined the intangible rights theory was beyond the scope of 18 U.S.C. § 1341, and limited the reach of the statute "to the protection of property rights." *McNally*, 483 U.S. at 360, 107 S.Ct. at 2882.

Following *McNally*, Congress passed the Anti–Drug Abuse Act of 1988, which included a provision amending the mail fraud statute by adding 18 U.S.C. § 1346.[30] Congress intended 18 U.S.C. § 1346 "to restore the mail fraud statute to its pre-*McNally* position by allowing mail fraud convictions to be predicated on deprivations of honest services." *United States v. Waymer*, 55 F.3d 564, 568 n. 3 (11th Cir.1995) (citing *United States v.*

*Martinez*, 905 F.2d 709, 715 (3d Cir.1990)), *cert. denied*, —— U.S. ——, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996). Section 1346 of Title 18 became effective 18 November 1988. *United States v. Henry*, 29 F.3d 112, 114 (3d Cir.1994); *Kehr*, 926 F.2d at 1417.

Post–*McNally* decisions have construed 18 U.S.C. §§ 1341 and 1346 as together proscribing schemes or artifices to deprive another individual of honest services, consistent with the accepted pre-*McNally* interpretation of 18 U.S.C. § 1341. *See, e.g., Grandmaison*, 77 F.3d 555; *United States v. Bryan*, 58 F.3d 933 (4th Cir.1995); *Waymer*, 55 F.3d 564; *United States v. Evans*, 30 F.3d 1015 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 236 (1995); *Henry*, 29 F.3d 112.

■ As indicated, the Second Superseding Indictment charged a scheme by Nicholas Bissell to defraud the citizens of Somerset County, Somerset County itself and the State of New Jersey of the honest services of the Somerset County Prosecutor. The Second Superseding Indictment enumerated several statutory sources of a prosecutor's duties. Second Superseding Indictment, ¶ 2, at 3–5 (citing N.J.S.A. §§ 2A:158–1, 2A:158–1.1, 2A:158–5, 2C:30–2, 40A:9–22.5(a), (c), (d), (e), (g), 40A:9–22.6; New Jersey Rules of Professional Conduct). The Second Superseding Indictment charged Nicholas Bissell breached these duties and, thereby, deprived the citizenry of the honest services of the Somerset County Prosecutor.

Nicholas Bissell was charged with maintaining two undisclosed business relationships with an adversary of the Office of the Somerset County Prosecutor. He was also charged with abusing his position to threaten the Distributor Owner and thereby gain a business advantage to which he was not oth-

---

**29.** *See, e.g., United States v. Silvano*, 812 F.2d 754, 758–59 (1st Cir.1987); *United States v. Gray*, 790 F.2d 1290, 1294–95 (6th Cir.1986), *rev'd*, *McNally*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292; *United States v. Alexander*, 741 F.2d 962, 964 (7th Cir.1984); *United States v. Clapps*, 732 F.2d 1148, 1152 (3d Cir.), *cert. denied*, 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. Frankel*, 721 F.2d 917, 920 (3d Cir.1983); *United States v. Margiotta*, 688 F.2d 108, 120–21 (2d Cir.1982), *cert.*

*denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Barber*, 668 F.2d 778, 784–85 & n. 4 (4th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982); *United States v. Mandel*, 591 F.2d 1347, 1359–62 (4th Cir.1979); *United States v. Brown*, 540 F.2d 364, 374 (8th Cir.1976).

**30.** Pub.L. No. 100–690, Title VII, § 7603(a), 102 Stat. 4181, 4058.

erwise entitled. Finally, Nicholas Bissell was charged with engaging in other activity inconsistent with his duties as the Somerset County Prosecutor. These activities include fraudulent operation of the Bedminster and Somerset Stations, also the subject of counts 12–18, criminal solicitation to assist in financial aid fraud, also the subject of count 19, and obstruction of justice, also the subject of counts 20–21.

The Second Superseding Indictment charged eleven mailings that furthered these unlawful activities and thereby deprived the citizenry of the right to an honest prosecutor. Nicholas Bissell was charged with completing and mailing: (1) five separate inaccurate financial disclosure statements, (2) documents and answers to interrogatories that allegedly covered up civil rights violations in the Federal Civil Action, and (3) four separate sets of inaccurate financial aid forms.

■ One need not violate a state law or regulation to be liable for mail fraud. *Bryan*, 58 F.3d at 940 (citing *Mandel*, 591 F.2d at 1361). Conversely, were a scheme or artifice to defraud construed to encompass "whatever is not a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of society,'" Federal judges would be "creating what in effect would be common law crimes. . . ." *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir.1987) (quoting *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir.1958)).

In this case, it was unnecessary to evaluate the outermost limits of 18 U.S.C. §§ 1341 and 1346. Courts have determined that Federal mail fraud encompasses political corruption, both before *McNally* and after the enactment of 18 U.S.C. § 1346. *See, e.g., Grandmaison*, 77 F.3d at 566 (abuse of position as alderman to influence award of construction contract); *Bryan*, 58 F.3d 933 (manipulation of advertising contracts for West Virginia Lottery); *Waymer*, 55 F.3d 564 (member of Atlanta Board of Education convicted for receiving percentage of proceeds on contracts between firms and school system); *Evans*, 30 F.3d 1015 (insurer convicted for giving state insurance regulator kickbacks for promoting its surety bonds); *Hen-*

*ry*, 29 F.3d 112 (bid rigging scheme related to Delaware River Joint Toll Bridge Commission); *United States v. Stoneman*, 870 F.2d 102 (3d Cir.) (scheme to obtain contracts from state and local entities by bribing public officials), *cert. denied*, 493 U.S. 891, 110 S.Ct. 236, 107 L.Ed.2d 187 (1989); *Holzer*, 816 F.2d 304 (judge repeatedly solicited and received loans from attorneys appearing before him); *Mandel*, 591 F.2d at 1347 (governor of State of Maryland accepted bribes in return for lobbying efforts).

■ Nicholas Bissell argued the illegal activity charged in the first eleven counts did not relate to actions taken in his official capacity. First Nicholas Bissell Moving Brief at 11–15; First Nicholas Bissell Reply Brief at 5; 4 Mar. 1996 Tr. at 2–5. This is not correct. For example, as evidence of his failure to provide honest law enforcement services, the Second Superseding Indictment charged Nicholas Bissell threatened to frame the Distributor Owner, obstructed justice and perjured himself in connection with the Federal Civil Action. Second Superseding Indictment, ¶ 10, at 7–8; ¶ 12, at 9. In addition, to the extent the acts charged concern Nicholas Bissell outside of his official capacity, fraud was nonetheless alleged.

As indicated, the Second Superseding Indictment accused Nicholas Bissell of violating several New Jersey statutes regulating the duties of a prosecutor. The Government argued one who violates the criminal code he or she has sworn to enforce has deprived the public of the right to the services he or she has promised. 4 Mar. 1996 Tr. at 6. The Government further argued Nicholas Bissell engaged in activities that conflicted with his position and responsibility as prosecutor and personally benefited because of this activity. *Id.* at 10. The Government argued Nicholas Bissell used the mails in furtherance of his effort to personally profit from these activities and in order to cover up his conduct. *Id.* These allegations fell within the boundary of conduct proscribed by 18 U.S.C. §§ 1341 and 1346. Violations of the Code of Criminal Justice are inconsistent with pledges to enforce it.

Nicholas Bissell attempted to distinguish the fraud alleged in the Second Superseding Indictment from the facts in the political corruption cases cited above. He argued there is a difference between the instant matter and cases in which "a public official fails to disclose the existence of a direct interest in the matter that he is passing on...." First Nicholas Bissell Moving Brief at 10 (citing *Mandel*, 591 F.2d at 1363–64); *see* First Nicholas Bissell Reply Brief at 6.

Aside from the fact Nicholas Bissell was charged with repeatedly defrauding business partners and engaging in financial aid fraud, these allegations of fraud are violations of the public trust, given the Somerset County Prosecutor's responsibility to "use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." N.J.S.A. § 2A:158–5.

Nicholas Bissell's fraud, in connection with the Bedminster and Somerset Stations, also violated Nicholas Bissell's duty to avoid conflicts of interest, to " 'devote his entire time to the duties of his office' " and not to engage in other employment. *See* Second Superseding Indictment, ¶ 2(d), at 4, ¶ 2(b), at 3 (citing N.J.S.A. § 2A:158–1.1). His failure to disclose his outside business interests, particularly those conducted with William Welaj ("Welaj"), violated his duty to " 'fully, truthfully and accurately disclose all material facts relating to his compliance with the Code of Ethics for Local Government Officers.' " N.J.S.A. § 40A:9–22.6. He also committed perjury in connection with the Federal Civil Action which concerned actions taken in his official capacity. Nicholas Bissell engaged in fraud, knowingly violated his duties as Prosecutor and entered into conflicts of interests. These activities compromised Nicholas Bissell's ability to faithfully, justly and impartially execute his official duties. He used the mails to further this criminal activity.

Nicholas Bissell had argued allegations of conflicts of interest arising from his interests in the RB & W Partnership and the Bedminster Station Partnership should be dismissed because they did not allege acts by him in his capacity as a public official. It was because of his status as the Somerset County Prosecutor, however, that the alleged conflicts arose. Second Superseding Indictment, ¶ 1(f), at 3; ¶ 5, at 6; Opposition Brief at 8–9. As indicated, as Prosecutor, Nicholas Bissell had the duty to abide by the New Jersey Rules of Professional Conduct and to avoid conflicts of interest. He also had the duty to " 'fully, truthfully and accurately disclose all material facts relating to his compliance with the Code of Ethics for local Government Officers.' " N.J.S.A. § 40A:9–22.6. Nicholas Bissell's interests in the RB & W Partnership and the Bedminster Station Partnership violated his duties and responsibilities as Prosecutor and defrauded the citizens of Somerset County. Accordingly, these matters fell within the scope of the "honest services" provisions of the mail fraud statutes.

### 4. *Retroactivity Argument*

Nicholas Bissell argued the Government sought to apply 18 U.S.C. § 1346 retroactively because some of the acts alleged occurred prior to 18 November 1988, the effective date of the "honest services" provision. First Nicholas Bissell Moving Brief at 21. As Nicholas Bissell indicated, the Second Superseding Indictment charged that, in March 1988, he "abused the power of the Office of the Prosecutor in order to extort a private personal benefit...." Second Superseding Indictment, ¶ 10, at 7.

The Circuit has held 18 U.S.C. § 1346 should not be given retroactive force. *Henry*, 29 F.3d at 114 (citing *Kehr*, 926 F.2d at 1417 n. 4). The *mailings* alleged in support of the first eleven counts, however, each occurred after 18 November 1988. Second Superseding Indictment, ¶ 14, at 10–11 (alleging mailings occurred between 3 October 1991 and 21 April 1995).

It is not improper to apply a criminal statute to a scheme that began prior to, but continued through, the effective date of the statute. *United States v. Garfinkel*, 29 F.3d 1253, 1259–60 (8th Cir.1994) (citing *United States v. Reetz*, 18 F.3d 595, 598 (8th Cir. 1994); *United States v. Hammen*, 977 F.2d 379, 385 (7th Cir.1992); *United States v. Alkins*, 925 F.2d 541, 549 (2d Cir.1991); *United States v. Torres*, 901 F.2d 205, 226

(2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990)). Because the mail fraud statutes seek to punish use of the mail to commit fraud, the dates of the alleged mailings were the appropriate inquiry. As indicated, the alleged mailings occurred after the effective date of the "honest services" provision. For these reasons, Nicholas Bissell's retroactivity argument was rejected.

### C. *Motion to Suppress the Videotapes*

#### 1. *Background*

Nicholas Bissell sought to suppress the Videotapes, which were made with a surveillance camera installed in the ceiling of the Bedminster Station with the consent of Thornburg. In February 1995, Federal investigators interviewed Thornburg, who discussed his investment in the Bedminster Station. 4 January 1996 Carbone Affidavit, ¶ 23. Thornburg indicated he had agreed to invest $100,000 in the Bedminster Station Partnership. Nicholas Bissell and Thornburg agreed that the former would maintain the Bedminster Station checking account and the latter would operate the Bedminster Station. Thornburg also indicated Nicholas Bissell later solicited additional funds from Thornburg,. representing that the Bedminster Station was operating at a loss. *Id.*

The Government stated that, following the meeting between Federal investigators and Thornburg, investigators compared receipts for cash Nicholas Bissell removed from the Bedminster Station on weekends with records . reflecting bank deposits he made. "Based upon this comparison, it appeared that a portion of the weekend receipts were not being deposited into the bank." 4 January 1996 Carbone Affidavit, ¶ 24. The Government then obtained written consent from Thornburg to install a video camera ("Camera") in the ceiling of the Bedminster Station. *Id.* & Ex. D.

The Government described the Bedminster Station as "a small square-shaped structure located on a main highway. . . ." 4 January 1996 Carbone Affidavit, ¶ 25. The building is surrounded by glass on three sides, and contains vending machines and automotive products offered for sale. *Id.* & Ex. C. The

Bedminster Station, which was open from 6:00 am to 11:00 pm, contained a desk behind the front window and bathrooms for use by employees and customers. *Id.*

The Government represented the Camera, which was placed in the ceiling immediately above the door, was programmed to record between 12:00 and 11:00 pm on Saturdays and Sundays. 4 January 1996 Carbone Affidavit, ¶ 26. The Government operated the Camera for three consecutive weekends. First Nicholas Bissell Brief at 6. "The [Videotapes] revealed that on each of the three weekends, [Nicholas Bissell] visited the [Bedminster S]tation and counted money. He appeared to place a portion in the bag, and put the remainder in his pockets." 4 January 1996 Carbone Affidavit, ¶ 27.

#### 2. *Testimony of Robert Krut*

On 11 March 1996, a hearing was held concerning admissibility of the Videotapes. At that hearing, United States Postal Inspector Robert Krut ("Krut") testified. On direct examination, Krut indicated he installed the Camera on 2 February 1995 and that the Camera operated for approximately three weeks. 11 Mar. 1996 Tr. at 6–7. Krut indicated the front of the Bedminster Station is approximately seventy-five feet from the highway; the one-room building measured approximately ten by fifteen feet; it contained a desk, with a credit card machine, abutted to the front window and vending machines behind the desk. *Id.* at 7–8. Krut indicated the one-room building contained rest rooms in the back but there were no partitions other than the rest room. *Id.* at 8–9. Krut was given a photograph of the Bedminster Station ("Government Ex. 1608"). He indicated the front desk and the credit card machine were visible through the front window, "from anywhere in the parking lot." *Id.* at 9.

Krut next viewed excerpts of the Videotapes that showed Nicholas Bissell either seated or standing behind the desk. The following ensued:

Q: Inspector Krut, did you have occasion, prior to installing the [Camera], to walk around the premises?

A: Yes.

Q: Did you look inside the windows?

A: Yes, I did.

Q: And can you see inside the building from inside the front, storefront area from anywhere in the parking lot or the side of the building?

A: Yes, I could.

Q: And would that include the area that [Nicholas Bissell] was videotaped in?

A: Yes, sir.

11 Mar. 1996 Tr. at 11. Cross examination followed:

Q: Is the view that one gets in this photograph [Government Ex. 1608] the view you had when you looked at the station from your vantage point on the property?

A: Essentially, yes.

Q: By the way, are there any people in the station? Can you tell from this photograph?

A: Not in this photograph, no.

Q: You can't tell or you don't know?

A: I can't tell.

Q: But that's the view you would have walking on the premises?

A: It's the gas station, yes.

11 Mar. 1996 Tr. at 17–18.

### 3. *Reasonable Expectation of Privacy*

 The purpose of the Fourth Amendment is to protect people from unreasonable searches and seizures.[31] The " 'capacity to claim the protection of the Fourth Amendment[32] depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' " *Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) (quoting *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430,

58 L.Ed.2d 387 (1978)); *see Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984) ("[T]he touchstone of [Fourth] Amendment analysis has been the question whether a person has a 'constitutionally protected reasonable expectation of privacy.' ") (quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)); *United States v. Reicherter,* 647 F.2d 397, 399 (3d Cir.1981).

 Determining whether an expectation of privacy is reasonable requires the application of a two-part test. The first part considers whether an individual has " 'exhibited an actual (subjective) expectation of privacy' "; the second part concerns whether an individual's subjective expectation of privacy is " 'one that society is prepared to recognize as "reasonable." ' " *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (quoting *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring)).

 The safeguards of the Fourth Amendment apply to both residential and commercial premises. *New York v. Burger,* 482 U.S. 691, 699, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601 (1987) (citing *See v. City of Seattle,* 387 U.S. 541, 543, 546, 87 S.Ct. 1737, 1739, 1741, 18 L.Ed.2d 943 (1967)). Although the test of the legitimacy of an expectation of privacy is the same in both the residential and commercial sphere, the case law does not provide a commercial property with the same degree of Fourth Amendment protection accorded to a residence. *United States v. Hall,* 47 F.3d 1091, 1095 (11th Cir.) (citing *Donovan v. Dewey,* 452 U.S. 594, 598–99, 101 S.Ct. 2534, 2538, 69 L.Ed.2d 262 (1981)), *cert. denied,* —— U.S. ——, 116 S.Ct. 71, 133 L.Ed.2d 31 (1995); *compare Oliver* 466 U.S. at 178, 104 S.Ct. at 1741 ("[T]he Court since the enactment of the Fourth Amendment has

---

**31.** The Fourth Amendment provides in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

**32.** "[V]ideotaping [is] a continuous search of anyone who enter[s] the camera's field of vision." *United States v. Taketa,* 923 F.2d 665, 675–76 (9th Cir.1991) (citing *United States v. Cuevas–Sanchez,* 821 F.2d 248, 251 (5th Cir. 1987); *United States v. Torres,* 751 F.2d 875, 882–83 (7th Cir.1984), *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985)).

stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.' ") (quoting *Payton v. New York*, 445 U.S. 573, 601, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980)) *with Hall*, 47 F.3d at 1095 ("The Supreme Court has consistently held that the [G]overnment is required to obtain a search warrant only when it wished to search those areas of commercial property from which the public has been excluded.") (citing *United States v. Dunn*, 480 U.S. 294, 316, 107 S.Ct. 1134, 1147, 94 L.Ed.2d 326 (1987) (Brennan, J., dissenting) (citing *City of Seattle*, 387 U.S. at 545, 87 S.Ct. at 1740)); *see Taketa*, 923 F.2d at 677 (concluding defendant had a reasonable expectation of privacy from video surveillance in office after considering, among other factors, that office was not open to the public).

■ The Government argued the Videotapes depict Nicholas Bissell counting cash at the desk facing the front window of the Bedminster Station, as shown on the Videotapes. If Nicholas Bissell had a subjective expectation of privacy at the front desk of the Bedminster Station, such an expectation was not objectively reasonable in light of the controlling case law. A review of the Videotapes indicated customers regularly entered the office, either to pay for gasoline, purchase automotive supplies or to use the vending machines behind the desk.

The Photographs reveal the building has large windows on three sides. The interior of the station is visible through the front windows from the public street. The desk faced the window. The desk was clearly visible through front and side windows in several photographs. In one photograph, the soda and cigarette machines located behind the desk can be clearly seen through the windows. In another photograph, a man can be clearly seen through one of the side windows standing at the desk. The windows to the office do not appear to have curtains or blinds; no efforts appear to have been undertaken to obstruct the view of the interior of the office from outside.

After a review of the case law and the photographs, it appeared that any expectation of privacy Nicholas Bissell may have had

as he stood or sat behind that desk was not objectively reasonable.

■ Nicholas Bissell argued the standards set out in 18 U.S.C. §§ 2510–20 for aural interception of communications apply to the Videotapes. First Nicholas Bissell Moving Brief at 35. Although video surveillance does not fall within the letter of these statutes, the Second, Fifth and Seventh Circuit Courts of Appeals have required applicants for warrants to videotape suspected criminal activities meet the higher standards required under these statutes for wiretap warrants. *Cuevas–Sanchez*, 821 F.2d at 251–52; *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 107, 93 L.Ed.2d 54, 56 (1986); *Torres*, 751 F.2d at 884–85. In this case, however, the issue is not what standards are required for an application for a warrant to conduct videotape surveillance, but whether the Fourth Amendment required a warrant.

As explained, Nicholas Bissell could have had no reasonable expectation of privacy while behind the desk in the Bedminster Station. The interior of the office can be clearly seen through the large windows on three sides of the building. Additionally, the Camera was installed in an office that was open to the public who would come in to pay their bills, ask directions or purchase soda, or other items. In fact, the cigarette machine was located directly behind the desk where Nicholas Bissell counted the money he took from the Bedminster Station. The Camera, moreover, was installed directly over the front door; this vantage point was not significantly different than that of a person standing outside the office and looking through the windows.

Nicholas Bissell's activity in the Bedminster Station office was not consistent with his argued expectation of privacy. Nicholas Bissell argued his "expectation that he would not be observed ... while he picked up the cash receipts is unarguably an expectation which society is prepared to recognize as reasonable." First Nicholas Bissell Moving Brief at 28. Nicholas Bissell, however, while counting money taken from the Bedminster Station cash receipts, stood directly at the

desk in front of the window. Throughout the Videotape taken of his activities at the Bedminster Station, numerous people entered the office. Nicholas Bissell could not, therefore, have had a reasonable expectation of privacy while in the office at the Bedminster Station. Accordingly, the standards for issuing a warrant to conduct video surveillance were not relevant to this motion.

### 4. Validity of Thornburg Consent

■■■■ As indicated, no "search" of the Bedminster Station occurred during the videotaping because Nicholas Bissell had no reasonable expectation of privacy while at the station. The entry of the Federal investigators onto the premises of the Bedminster Station to install the camera, moreover, did not itself constitute an improper warrantless search because Thornburg consented to the entry. A warrantless search does not violate the Fourth Amendment if a third party with common authority over the premises consents to such a search. *Illinois v. Rodriguez,* 497 U.S. 177, 179, 110 S.Ct. 2793, 2796, 111 L.Ed.2d 148 (1990) (citing *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). In such cases, the Government bears the burden of demonstrating consent is valid. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). To establish valid third-party consent, the Government must demonstrate consent was freely and voluntarily given, *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973), by one "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock,* 415 U.S. at 171, 94 S.Ct. at 993.

There is no question Thornburg had common authority over the Bedminster Station, or that he freely consented to installation of the Camera. As a partner, he had common authority over property of the Bedminster Station Partnership. *See United States v.*

*Jamieson–McKames Pharm.,* 651 F.2d 532, 542–43 (8th Cir.1981) (individuals who were "in business" together had *Matlock* common authority to consent to search of business premises), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). Thornburg, moreover, was the manager of the Bedminster Station and was entrusted with its day-to-day operation. Thornburg was also a signatory to the lease and possessed the keys to the Bedminster Station.

The Federal investigators reasonably relied upon Thornburg's "authority over or other sufficient relationship to the premises" when they installed the video camera. *See Matlock,* 415 U.S. at 171, 94 S.Ct. at 993. Thornburg informed the agents he was the manager and part owner of the Bedminster Station. As indicated, he had the key to the Bedminster Station and allowed them access to the office. Based upon these facts, the Federal investigators were justified in believing Thornburg had the requisite authority to allow them to enter the office and install the video camera. Accordingly, the warrantless entry did not violate the Fourth Amendment. *Rodriguez,* 497 U.S. at 179, 110 S.Ct. at 2796. Because Nicholas Bissell had no reasonable expectation of privacy at the Bedminster Station and Thornburg gave valid consent to the Government to install the Camera, the motion to suppress the Videotapes was denied.[33]

### D. Motion By Nicholas Bissell for Production of Unredacted Copy of LaRose 15 April 1995 Affidavit and Motion by the Government for a Protective Order

Nicholas Bissell sought an order compelling the Government to furnish an unredacted copy of the LaRose 15 April 1995 Affidavit. First Nicholas Bissell Moving Brief at 39. In the alternative, Nicholas Bissell sought an *in camera* inspection of the redacted material to determine whether the contents would be helpful to preparing his de-

---

**33.** In addition, courts have upheld third-party consent to electronic surveillance. *United States v. Bruneau,* 594 F.2d 1190, 1194 (8th Cir.) (consent by owner of airplane to attach electronic tracking device upheld), *cert. denied,* 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979); *United*

*States v. Miroyan,* 577 F.2d 489, 493 (9th Cir.) (same), *cert. denied,* 439 U.S. 896, 99 S.Ct. 258, 58 L.Ed.2d 243 (1978); *United States v. Abel,* 548 F.2d 591, 592 (5th Cir.) (same), *cert. denied,* 431 U.S. 956, 97 S.Ct. 2678, 53 L.Ed.2d 273 (1977).

fense. *Id.* at 40. The Government sought a protective order to seal the redacted contents. First Government Notice of Motion; 4 January 1996 Carbone Affidavit, ¶ 3; Sealed Affidavit, ¶ 2. The parties indicated on the record on 15 April 1996 these motions were moot in light of events that occurred after the motions were filed. 15 Apr. 1996 Tr. at 4.

### E. *Pretrial Disclosure of Brady and Giglio and Jencks Act Material; Motion for Reciprocal Discovery*

Nicholas and Barbara Bissell each sought disclosure of *Brady, Giglo* and Jencks Act material. First Nicholas Bissell Moving Brief at 41–43; First Nicholas Bissell Reply Brief at 20; Barbara Bissell Moving Brief at 14–18; Barbara Bissell Reply Brief at 2. Specifically, Barbara Bissell sought any information bearing on the credibility of witnesses the Government intended to call at trial, including records of arrests, indictments or criminal informations, convictions, criminal or civil investigations or any other criminal conduct by such individuals. Barbara Bissell Moving Brief at 16. In addition, Barbara Bissell sought information relating to agreements between potential witnesses and the Government, with copies of relevant documents and "any and all actions, promises, efforts or inducements—formal or informal—on the part of the [G]overnment, its agents and representatives to aid assist or obtain benefits of any kind, at any time for person (sic) whom the [G]overnment considers a potential witness at trial." *Id.* Barbara Bissell sought bias and impeachment evidence. *Id.* at 17.

Finally, she alleged the Attorney General of the State of New Jersey has investigated some of the same material on which the Second Superseding Indictment was grounded. Barbara Bissell sought "discovery of this investigation and all statements of witnesses and reports developed from the investigation as *Brady/Giglio/Agurs* material." *Id.* The Government sought reciprocal discovery. Opposition Brief at 97; First Government Notice of Motion; 4 January 1996 Carbone Affidavit, ¶ 3.

In addition to joining in the Barbara Bissell request for the material summarized above, Nicholas Bissell "[sought] an order compelling the Government to furnish any and all information in its possession with reference to potential Government witnesses, William Welaj, Nicholas L. Bissell, Sr., Jean Bissell, Warren Kimber, and Carl Braun...." First Nicholas Bissell Moving Brief at 41. Nicholas Bissell indicated he received a letter, dated 13 October 1995 (the "13 October 1995 Letter"), from the Government, which provides in pertinent part:

> With respect to your request for *Brady* materials, you are advised that William Welaj, Nicholas L. Bissell, Sr., Jean Bissell, Warren Kimber, and Carl Braun, *may* provide exculpatory information helpful to the defense. At our conference, you seemed to suggest that there was some other potential *Brady* material which has been withheld. If you believe the Government is in possession of any such information, kindly give us some indication of what it is. At this time, the Government has fully complied with its *Brady* obligations. We understand, of course, that the obligation is continuing in nature." (emphasis added).

*Id.* at 41–42. Nicholas Bissell sought full disclosure of *Brady* material related to the five individuals listed in the 13 October 1995 Letter. Nicholas Bissell argued the Government had been evasive concerning such *Brady* material. *Id.* at 42–43.

#### 1. *Brady Material*

In *Brady*, the Court held the Government's failure to disclose evidence favorable to a defendant who specifically requested it violated the right of the accused to Due Process when the evidence was material to either guilt or punishment, "irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1197. Under *Brady*, materials must be disclosed if they "go to the heart of the defendant's guilt or innocence [or] might affect the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Hill*, 976 F.2d 132, 134–35 (3d Cir.1992) (citing *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766).

In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court modified the *Brady* rule to require the Government to disclose exculpatory evidence even when the defendant had not requested the information. *Id.* at 107, 96 S.Ct. at 2399; *see United States v. Giampa,* 904 F.Supp. 235, 280 n. 33 (D.N.J.1995). In *Giglio,* the Supreme Court held the *Brady* rule includes information that could be used to impeach the credibility of Government witnesses when the reliability of the witness could help determine the guilt or innocence of the accused. *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766; *see United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *United States v. Starusko,* 729 F.2d 256, 260 (3d Cir.1984); *United States v. Higgs,* 713 F.2d 39, 42 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984).

■■■ *Brady* material must ordinarily be disclosed "in time for its effective use at trial." *Higgs,* 713 F.2d at 44. "A district court has general discretionary authority to order the pretrial disclosure of *Brady* material 'to ensure the effective administration of the criminal justice system.'" *Giampa,* 904 F.Supp. at 281 (quoting *Government of Virgin Islands v. Martinez,* 847 F.2d 125, 127 (3d Cir.1988)); *see Starusko,* 729 F.2d at 261; *Higgs,* 713 F.2d at 42. The Circuit has indicated district courts should encourage early production of *Brady* material. *Starusko,* 729 F.2d at 261 (citing *United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 739 (3d Cir.1978); *United States v. Kaplan,* 554 F.2d 577, 578 (3d Cir.1977); *Giampa,* 904 F.Supp. at 281.

The Government asserted it was aware of its obligation to disclose all *Brady* and had already done so. Opposition Brief at 64. The Government asserted it was aware of no *Brady* material concerning the individuals mentioned in the 13 October 1995 Letter, and maintained it identified these witnesses "because of their close relationship" with Defendants and "in an over abundance of caution." *Id.* at 64–65.

Nicholas Bissell had not pressed the issue in the First Nicholas Bissell Reply Brief or at the pretrial status conference held 9 April 1996 (the "9 April 1996 Status Conference"). The Government also asserted it had produced information concerning an investigation by the Attorney General of the State of New Jersey into activities alleged in the Second Superseding Indictment, *id.* at 65, a matter Barbara Bissell had not pressed in subsequent submissions or at pretrial status conferences. Accordingly, the *Brady* motions were denied as moot.

### 2. *Giglio Material*

■■■ Although *Brady* material includes information that may be used to impeach the credibility of a prosecution witness, the Government is not obligated to disclose *Giglio* material prior to trial. *Giampa,* 904 F.Supp. at 281. A defendant's due process rights "will be fully protected if disclosure is made the day that the witness testifies." *Higgs,* 713 F.2d at 44.

■■■ In *Higgs,* the Circuit held the trial court abused its discretion by ordering disclosure of *Giglio* material one week before to trial. "The purpose of requiring disclosure of impeachment information is not to assist the defense in a general pretrial investigation, but to give the defense an opportunity to effectively cross-examine the Government's witnesses at trial." *Giampa,* 904 F.Supp. at 281.

Barbara Bissell argued *Kyles v. Whitley,* —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) requires *Giglio* material to be disclosed concurrently with *Brady* material, thereby erasing the distinction between *Giglio* and *Brady* disclosure requirements set out in *Higgs* and other case law. 16 Oct. 1995 Tr. at 14–15; Barbara Bissell Moving Brief at 14; Barbara Bissell Reply Brief at 2. *Kyles* does not stand for the proposition for which it was cited. In fact, *Kyles,* a fact-driven decision, did not concern *Giglio* material. In that case, the majority determined that the prosecution had failed to honor its *Brady* obligations because a informant made several inconsistent statements during various meetings with investigators.

Barbara Bissell demanded material relating to credibility of Government witnesses. This is *Giglio* material, as indicated. Al-

though the case law requires disclosure of *Giglio* material on the day a witness testified, the Government had agreed to disclose this material "no later than one day before the witness in question testifies at trial." Opposition Brief at 68. Accordingly, motions for early disclosure of *Giglio* material were denied.

### 3. *Jencks Act Material*

Under the Jencks Act and Rule 26.2, a Federal criminal defendant may request pretrial statements of a Government witness which relate to the testimony of that witness following the completion of direct examination of that witness.

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness (other than the defendant) shall be the subject of subpena (sic), discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a); *see Palermo v. United States,* 360 U.S. 343, 349, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287 (1959) (noting the purpose of 18 U.S.C. § 3500(a) is to restrict the use of such statement to impeachment).

The Jencks Act further provides:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the [Government] to produce any statement ... of the witness in the possession of the [Government] which relates to the subject matter [34] as to which the witness has testified.

18 U.S.C. § 3500(b). The term "statement" includes statements written or adopted by a witness and "stenographic, mechanical, electrical, or other recording[s] or a transcription thereof, which is a substantially verbatim recital of an oral statement" made by a wit-

ness. A statement by a witness to a grand jury is also included in this definition. 18 U.S.C. § 3500(e).

The term "statement" should be appropriately construed. *Palermo,* 360 U.S. at 350, 79 S.Ct. at 1223 (holding defense cannot compel disclosure of memoranda containing a Government agent's interpretation of a witness' statements, because such statements are not "the witness' own [but] rather ... the product of the investigator's selections, interpretations and interpolations."). When considering whether something qualifies as a "statement" under the Jencks Act, a court must consider whether "the statement could fairly be deemed to reflect fully and without distortion what had been said to the [G]overnment agent.... Summaries of an oral statement which evidence substantial selection of material, or were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions." *Id.* at 352–53, 79 S.Ct. at 1224–25.

Once Defendants establish that the Jencks Act entitles them to a statement, they need not show any impeachment value or inconsistency with statements made by a witness at trial to require the Government to produce it. *Brumel–Alvarez,* 991 F.2d at 1464 ("The prosecution is obligated to disclose to the defense statements falling within the Jencks Act regardless of anyone's perception of the utility of the statements for impeachment.") (citations and internal quotations omitted).

The Jencks Act requires the Government to divulge to Defendants statements by witnesses only after such witnesses testify at trial. 18 U.S.C. § 3500(a). Upon such disclosure, Defendants are to receive a reason-

---

**34.** If the Government alleges a statement does not relate to the subject matter of the testimony of the witness, a court must direct the Government to deliver a copy of the statement to the court for examination. "[T]he court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness." If a portion of a statement is withheld and Defendants object, the Government

must preserve the withheld material for review by the Circuit if the matter is appealed.

In determining whether a statement relates to the direct testimony of the witness, "it must relate generally to the events and activities testified to." *United States v. Brumel–Alvarez,* 991 F.2d 1452, 1464 (9th Cir.1993) (quotations and emphasis omitted).

able time to prepare to use such statements at trial. *See id.* Although the disclosure of Jencks material prior to the conclusion of direct examination of the Government's wit‐ness cannot be compelled, early disclosure to obviate trial interruptions is encouraged. *Hill,* 976 F.2d at 140 (citing *United States v. Murphy,* 569 F.2d 771, 773 n. 3 (3d Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978)). In this case, the Gov‐ernment agreed to disclose all Jencks materi‐al no later than the day before the applicable witness testifies at trial. Opposition Brief at 68–69. Accordingly, the motions demanding early disclosure of Jencks Act material were denied.

### 4. *Motion for Reciprocal Discovery*

There was no dispute concerning this mo‐tion. *See* First Nicholas Bissell Reply Brief at 21 ("With respect to the Government's motion for reciprocal discovery, [Nicholas Bissell] did not object to providing such dis‐covery which is consistent with the Federal Rules of Criminal Procedure."); Barbara Bissell Reply Brief at 6 ("Counsel will pro‐vide the [G]overnment with all reciprocal dis‐covery as it becomes available."). At the 9 April 1996 Status Conference, the Govern‐ment did not indicate it had any outstanding disputes concerning discovery. This motion was denied as moot.

### F. *Severance Motions*

Barbara Bissell sought to sever her trial from that of Nicholas Bissell. Barbara Bis‐sell Moving Brief at 6–12; Barbara Bissell Reply Brief at 4–5. In the alternative, she sought to sever counts 12–16 and 23–33 from the balance of the Second Superseding In‐dictment. Barbara Bissell Moving Brief at 12–13; Barbara Bissell Reply Brief at 4–5. In addition, Nicholas Bissell moved to sever counts 1–11 and 20–21 from the balance of the Second Superseding Indictment. First Nicholas Bissell Moving Brief at 45–46.

The interests of justice are served by a joint trial. Federal Rule of Criminal Proce‐dure 8 ("Rule 8") permits two or more of‐fenses to be charged in the same indictment, "in a separate count for each offense if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constitut‐ing parts of a common scheme or plan." Fed.R.Crim.P. 8(a) (joinder of offenses).

Rule 8 further provides two or more defen‐dants

> may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions consti‐tuting an offense or offenses. Such trans‐actions may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8(b) (Joinder of Defendants).

█ Federal Rule of Criminal Procedure 14 ("Rule 14") authorizes a trial court to sever counts or defendants where, despite an indictment's technical compliance with Rule 8, joinder would result in a "manifestly unfair trial." *Giampa,* 904 F.Supp. at 265; *United States v. Cannistraro,* 800 F.Supp. 30, 87 (D.N.J.1992); *United States v. Vastola,* 670 F.Supp. 1244, 1261 (D.N.J.1987) (citing *Reic‐herter,* 647 F.2d at 400). Rule 14 provides in relevant part:

> If it appears that a defendant or the [G]ov‐ernment is prejudiced by a joinder of of‐fenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a sever‐ance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14. Severance pursuant to Rule 14 is within the discretion of the trial court. *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993) ("Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts"); *United States v. McGlory,* 968 F.2d 309, 340 (3d Cir.1992) (citing *United States v. Sandini,* 888 F.2d 300, 305–06 (3d Cir.1989), *cert. denied,* 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990)), *cert. denied,* 507 U.S. 962, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1993); *Giampa* 904 F.Supp. at

265; *United States v. Eisenberg,* 773 F.Supp. 662, 697 (D.N.J.1991).

 In *Zafiro,* the Court stated:

We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*Zafiro,* 506 U.S. at 539, 113 S.Ct. at 938. There is a preference for joint trials where defendants, as here, are indicted together. *Id.* at 537, 113 S.Ct. at 937 (citing *Richardson v. Marsh,* 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987)). Judicial economy and avoidance of inconsistent verdicts are among the policy objectives of joint trials. *Id.* (citing *Richardson,* 481 U.S. at 210, 107 S.Ct. at 1708–09).

 A defendant bears a "heavy burden" when moving for severance under Rule 14. *See United States v. Eufrasio,* 935 F.2d 553, 568 (3d Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991); *Sandini,* 888 F.2d at 305; *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). Mere allegations of prejudice are insufficient to meet this burden. *Giampa,* 904 F.Supp. at 265. Defendants must "pinpoint 'clear and substantial prejudice' resulting in an unfair trial." *McGlory,* 968 F.2d at 340 (quoting *Eufrasio,* 935 F.2d at 568); *Giampa,* 904 F.Supp. at 265; *see also United States v. Wright–Barker,* 784 F.2d 161, 175 (3d Cir.1986). Defendants are not entitled to severance "merely because they may have a better chance of acquittal in separate trials." *Zafiro,* 506 U.S. at 540, 113 S.Ct. at 938; *McGlory,* 968 F.2d at 340; *Giampa,* 904 F.Supp. at 265.

 A risk of prejudice may often be cured with an appropriate jury instruction. *Zafiro,* 506 U.S. at 540, 113 S.Ct. at 939. "[J]uries are presumed to follow their instructions." *Id.* The issue, then, is " 'whether the [J]ury can be reasonably be expected to compartmentalize the evidence against each defendant.' " *Giampa,* 904 F.Supp. at 266 (quoting *Eufrasio,* 935 F.2d at 568).

### 1. *Motion to Sever the Trials of Nicholas and Barbara Bissell*

 Barbara Bissell argued a joint trial would subject her to undue prejudice because the acts alleged of Nicholas Bissell would be attributed to her. Barbara Bissell Moving Brief at 6–8, 11–12; 4 Mar. 1996 Tr. at 30–31. In that regard, she observed there were no allegations that "she had anything to do with Nicholas L Bissell's ... violation of the public trust, fraud on his employees/distributors, fraud on his gasoline distributor, extortion by threatening to plant drugs in an individual's car with a threat of subsequent arrest and prosecution by the Somerset County Prosecutor's Office." Barbara Bissell Moving Brief at 12; *see* Barbara Bissell Reply Brief at 4 ("Barbara Bissell is unfairly caught up with the [G]overnment's excessive animus toward her codefendant that has motivated an inappropriate and inaccurate press release and photograph which received prominent and widespread publication in substantial newspapers.").

As his wife, argued Barbara Bissell, the jurors in a joint trial will regard her as Nicholas Bissell's partner in crime without regard to the evidence. 4 Mar. 1996 Tr. at 31; Barbara Bissell Moving Brief at 7. In addition, she argued her husband would provide exculpatory testimony only if severance was granted. In the event of a joint trial, she argued Nicholas Bissell would exercise his Fifth Amendment right not to testify.[35] Barbara Bissell Moving Brief at 8–10. Barbara Bissell argued, "[Nicholas Bissell's] testimony would be exculpatory with respect to the role [she] played in regard to tax returns and payments made from the account of Bissell's, Inc." *Id.* at 9. Further, she argued limiting instructions will prove unwieldy, confusing and ineffective. *Id.* at 11; 4 Mar. 1996 Tr. at 31 ("Ninety percent of [the jury charges] do not apply to Barbara Bissell.").

**35.** Nicholas Bissell did in fact testify and was subject to examination by counsel for Barbara Bissell.

A severance argument based on the need for the testimony of a co-defendant warrants consideration of four factors: (1) the likelihood that the co-defendant will testify (2) the degree to which such testimony would be exculpatory (3) the degree to which such testimony could be impeached and (4) the effect of severance on judicial economy. *United States v. Gonzalez*, 918 F.2d 1129, 1137 (3d Cir.1990) (citing *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir.), cert. denied, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978)), cert. denied, 499 U.S. 982, 111 S.Ct. 1637, 113 L.Ed.2d 733 (1991). Although Barbara Bissell asserted her husband would provide exculpatory testimony if she were tried separately, " '[b]are assertions that co-defendants will testify are insufficient.' " *Gonzalez*, 918 F.2d at 1137 (quoting *Boscia*, 573 F.2d at 832). At the time this motion was decided, Nicholas Bissell had not indicated any position on the issue; as noted he did testify at trial.

It was doubtful, at the time of the motion, that the testimony of Nicholas Bissell would be exculpatory. As the trial demonstrated, Nicholas Bissell was neither an effective nor a credible witness.

Barbara Bissell was alleged to have played a substantial role in the acts alleged. Barbara Bissell, along with Nicholas Bissell, was charged with defrauding Thornburg in connection with the Bedminster Station Partnership. As indicated, the Second Superseding Indictment charged Barbara Bissell, in conjunction with Nicholas Bissell, "routinely embezzled cash from the Bedminster [S]tation" without informing Thornburg. Second Superseding Indictment, ¶ 9, at 13.

At times, Barbara Bissell was an officer of Budco which owned the franchise to operate the Bedminster Station. She was involved in, and was the bookkeeper for, the Bedminster Station and maintained the Bedminster Station checkbook records. Second Superseding Indictment, ¶ 2, at 12. She, moreover, signed false corporate and personal tax returns relating to income derived from the Bedminster Station. *Id.*, ¶¶ 1–3, at 33–34; 1–4, at 35–36.

In furtherance of the fraud against Thornburg, described in counts 12–16 of the Sec-

ond Superseding Indictment, Barbara Bissell paid personal expenses with the Bedminster Station Partnership's funds. *Id.*, ¶ 8, at 13; ¶ 4, at 29. These included "payments for a 1988 Mercedes Benz automobile, a 1992 Acura Legend LS, a 1995 Jeep Grand Cherokee, a cellular telephone and personal expenses charged on the station's credit card." *Id.*, ¶ 8, at 13. She also maintained payroll records, *id.*, ¶ 2, at 12, for employees of the Bedminster Station who were paid "off the books." *Id.*, ¶ 8, at 30.

Severance was not in the interest of judicial economy. As indicated, Defendants were charged in conjunction with fraudulently running the Bedminster Station and committing tax evasion. Accordingly, the separate trials would involve many of the same witnesses and much of the same documentary proofs. This duplication of effort was unjustified and simply not necessary.

Barbara Bissell failed to demonstrate the requisite prejudice for severance. Thirteen counts named Barbara Bissell. She was charged with tax evasion in jointly-filed income tax returns. She was charged with defrauding Thornburg in connection with the Bedminster Station, for which she kept the financial records. These charges alleged that Barbara and Nicholas Bissell together stole approximately $146,482 from Thornburg over a four year period. Defendants were, moreover, alleged to have together "concealed their activities" from Thornburg.

As indicated, the Second Superseding Indictment charged Barbara Bissell, in conjunction with Nicholas Bissell, mailed payments of bills relating to personal expenses including automobile payments, cellular phone charges and credit card charges. Second Superseding Indictment, ¶ 11, at 13–14. These payments were alleged to have been made with money from the Bedminster Station. *Id.*, ¶ 8, at 13–14. Defendants were also charged with mailing Budco's fraudulently prepared corporate tax return in 1993. *Id.*

Count 22 charged Nicholas Bissell with making false statements to Federal Agents. Second Superseding Indictment, ¶¶ 1–9, at 27–28. Nicholas Bissell made these state-

ments after Defendants' home was searched and more than $9,000 in cash, belonging to Barbara Bissell, was discovered. *Id.*, ¶ 4, at 27. Barbara Bissell also insisted on the opportunity to speak to the several Federal Agents and made statements not dissimilar to those made by her husband. These statements were made with the purpose of covering up Defendants' common scheme to defraud Thornburg. *Id.*, ¶ 9. Furthermore, the fraudulent operation of the Bedminster Station was charged as part of the conduct which compromised Nicholas Bissell's "ability to faithfully, justly and impartially" execute his duties as County Prosecutor. *Id.*, ¶ 11, at 8.

On the facts alleged, it was not reasonable to find that Barbara Bissell would be prejudiced by a "spillover" of evidence against Nicholas Bissell, or that a joint trial would have been "manifestly unfair" to her. As indicated, the Second Superseding Indictment charged Barbara Bissell was an active participant to the fraud and tax evasion charges arising from Defendants' operation of the Bedminster Station. The fraudulent operation of the Bedminster Station, moreover, was charged as conduct which compromised Nicholas Bissell's ability to carry out his duties as County Prosecutor. Accordingly, the charges against Barbara Bissell were connected with the charges against Nicholas Bissell. It was determined she would not be prejudiced by a "spillover" of evidence against Nicholas Bissell, or that a joint trial would be "manifestly unfair" to her. Barbara Bissell's motion to sever her trial was denied.

2. *Motion by Barbara Bissell to Sever Counts 12–16 and 23–33 from the Remainder of the Second Superseding Indictment*

▮ Barbara Bissell alternatively argued counts 1–11 and 17–22 should be severed from counts 12–16 and 23–33. The former group, she observed, concerned acts of Nicholas Bissell alone, and in his official capacity as Somerset County Prosecutor; the latter group concerned acts of both Defendants. Barbara Bissell Moving Brief at 12–13. None of the evidence relevant to one set of

allegations, she argued was relevant to the other; she also argued separate trials would not be no less efficient than a joint trial. *Id.* at 13; 4 Mar. 1996 Tr. at 34.

Severance of these counts was inappropriate. The factual predicates of counts 1–11 and 17–22 had much in common with the facts alleged in counts 12–16 and 23–33. Counts 1–11 alleged Nicholas Bissell defrauded others of the honest services of the Somerset County Prosecutor, due in part to fraudulent operation of the Bedminster Station. Nicholas Bissell's involvement with the Bedminster Station was central to the charges contained in counts 1–11. As indicated, his fraudulent operation of the Bedminster Station was charged as conduct which compromised his duties as County Prosecutor. This conduct, moreover, allegedly violated his duty, to "devote his entire time to the duties" of County Prosecutor and not to engage in outside employment. Second Superseding Indictment, ¶ 2(b), at 3 (citing N.J.S.A. 2A:158–1.1).

Count 17, which charged Nicholas Bissell with fraud on the investors in the Somerset Station involved a similar course of conduct and dealing as counts 12–16. Count 18, which charged Nicholas Bissell with fraud on the Distributor was connected to the fraudulent operation of the Bedminster Station. As indicated, count 22 charged Nicholas Bissell with lying to Federal Agents in an attempt to cover up the fraudulent operation of the Bedminster Station.

It appeared, therefore, that in addition to the related facts and charges, were separate trials held, evidence would be presented and witnesses would be called twice. As well, it was determined a joint trial would not (and did not) prejudice Barbara Bissell. Accordingly, the motion by Barbara Bissell to sever counts 12–16 and 23–33 of the Second Superseding Indictment was denied.

3. *Motion by Nicholas Bissell to Sever Counts 1–11 and 20–21 From the Remainder of the Second Superseding Indictment*

▮ Nicholas Bissell sought severance of counts 1–11 and 20–21 from counts 12–19 and 22–33. He argued allegations concerning

"official acts" contained in counts 1–11 and 20–21 should be tried separately from those concerning actions he allegedly took as a "private individual." First Nicholas Bissell Moving Brief at 45–46. He argued: "Requiring [Nicholas Bissell] to be tried both as a public official and a private individual in one case will bring about real and substantial prejudice...." *Id.* at 46.

The allegations regarding Nicholas Bissell's "private acts," contained in counts 12–19 and 22–33, however, were tied to the allegations of his "public acts," that Nicholas Bissell sought to sever. For example, counts 12–16 charge Defendants defrauded Thornburg. As indicated, Nicholas Bissell was alleged to have solicited Thornburg's initial $100,000 investment in the Bedminster Station. He was alleged to have falsely represented to Thornburg the Bedminster Station was losing money in order to fraudulently solicit an additional $23,000 from Thornburg. Finally, Defendants were alleged to have "routinely embezzled cash from the Bedminster Station." Second Superseding Indictment, ¶ 9 at 13.

Nicholas Bissell's duties as Somerset County Prosecutor, as provided by New Jersey Law and the New Jersey Rules of Professional Conduct, made the same conduct that is the basis for the charges against him as a "private individual" the basis for the charges against him as a "public official." For example, Nicholas Bissell's "fraudulent operation" of the Bedminster Station, which was the subject of counts 12–16 and 18 of the Second Superseding Indictment, the "fraudulent operation of the Somerset Station, the subject of count 17, and the "criminal solicitation of a vendor of the Prosecutor's Office to prepare fraudulent tax returns," which was the subject of count 19, were all charged as unlawful conduct that compromised Nicholas Bissell's ability to execute his duties as Somerset County Prosecutor, "thereby depriving the public of their right to the honest ... services of their chief law enforcement officer." Second Superseding Indictment, ¶ 11, at 8.

Given the similarity of the factual allegations in both sets of counts, the "spillover" argument was without merit. The motion by Nicholas Bissell for severance was denied.

### G. Motions Relating to Seized Currency

On 19 April 1995, the Government executed a search warrant on Defendants' home. 4 January 1996 Carbone Affidavit, ¶ 28. At that time, the Government discovered $9,000 "in cash that was found in an evening purse" and $289 "also in cash that was found in a shoe box in the bedroom closet." Barbara Bissell Moving Brief at 33. Barbara Bissell filed the Motion for Return of Seized Currency. *Id.* Nicholas Bissell sought an *in limine* hearing to determine the admissibility of the Currency. First Nicholas Bissell Moving Brief at 44.

### 1. Motion by Barbara Bissell for Return of Seized Currency

Barbara Bissell argued she needed the Currency for her trial-related expenses. Barbara Bissell Moving Brief at 33. She further argued there was no evidentiary value to the Currency in its then current form because the Government subjected it to tests that left it blackened, no identifiable prints were lifted and the serial numbers on the seized bills were not at issue in the case. *Id.* at 35. Barbara Bissell agreed to permit photographs of the Currency to be offered into evidence and to stipulate to the amount seized, the specific location in her home from which it was seized and "any other reasonable means to preserve the evidentiary value of the [C]urrency." *Id.* at 35–36; 4 Mar. 1996 Tr. at 36 ("I would agree to a stipulation that this money was found and where it was found and how it was found.").

The Government argued the Currency had evidentiary value and should be presented to the jurors, along with photographs of the Currency in the condition in which it appeared when seized and before it was subjected to tests by the Government. 4 Mar. 1996, Tr. at 37–41. The Government also argued it should retain the Currency in the interests of the IRS or other potential victims, in the event the jury returned a guilty verdict on the Second Superseding Indictment. Opposition Brief at 74–75; 4 Mar. 1996 Tr. at 40.

At oral argument on the Omnibus Motions, the Government argued it had two interests with regard to the money. First, the Government argued the money had evidentiary value. 4 Mar. 1996 Tr. at 37. The Government argued a photograph of the money as it was found was a poor substitute for the money itself:

> The Court: Why can't you show them a photograph of what you seized?
>
> Mr. Carbone: Judge, there is nothing—I guess you'd really have to see it, and I apologize to the Court for not having it here, but it's folded in hundred dollar increments, and there are little Post–Its on where [Barbara Bissell] was keeping a running balance.

4 Mar. 1996 Tr. at 38.

An oral argument, the Government was questioned regarding the probative value of the Currency:

> The Court: ... If [Defendants are] stipulating to every aspect you're trying to prove, why should we go through that exercise? How are you prejudiced if I say turn that money back and you have a valid stipulation?
>
> Mr. Carbone: Judge, first of all, turning the money back wouldn't do any good at this point because it's black.
>
> The Court: Then give them monies fungible, the currency.
>
> Mr. Carbone: I think the jury is entitled to see what was seized. We're not required to—
>
> The Court: The blackened money?
>
> Mr. Carbone: They're entitled to see it.
>
> The Court: It wasn't seized in that condition, was it?
>
> Mr. Carbone: Judge, they're entitled to see the money in the pocketbook where it was seized.
>
> The Court: Excuse me. Was it seized in that condition?
>
> Mr. Carbone: No, it was not.
>
> The Court: Who put it in that condition?
>
> Mr. Carbone: The Government did.
>
> The Court: Then how can they see it in the condition in which it was seized?

> Mr. Carbone: They'll see it with either an instruction or an explanation by a witness that this is what happens when you try to lift fingerprints off money.

4 Mar. 1996 Tr. at 37–38.

Second, the Government argued it had probable cause to believe the Currency was part of the funds Defendants allegedly skimmed from the Bedminster Station. The Government argued the IRS or a victim would be entitled to the Currency upon a guilty verdict. *Id.* at 42.

The Motion by Barbara Bissell for Return of Seized Currency subsequently became moot. At trial, the Government moved to admit the Currency into evidence. Despite the effect the Government's fingerprint testing had on the appearance of the Currency, counsel for Barbara Bissell made no objection to the Currency being entered into evidence. Trial Tr. at 327. At trial, a Government witness informed the jury the fingerprint testing had "darkened" the appearance of the Currency. *Id.* at 330. The Government witness also confirmed that "[o]ther than its dirty appearance" there was no difference in the condition and appearance of the Currency from when it was discovered. *Id.*

2. *Motion by Nicholas Bissell for an In Limine Hearing to Determine Admissibility of Seized Currency*

Nicholas Bissell argued judicial economy weighed in favor of a pretrial determination whether the Currency was admissible in evidence. First Nicholas Bissell Moving Brief at 44. Nicholas Bissell did not advance any argument why the Currency was inadmissible against him or why such a pretrial determination was appropriate. *United States v. Bethancourt,* 65 F.3d 1074, 1079 (3d Cir.1995) (holding it was relevant to admit in evidence cash found in home of defendant charged with crimes involving pecuniary gain), *cert. denied,* —— U.S. ——, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996); *United States v. Pungitore,* 910 F.2d 1084, 1146 (3d Cir.1990) (evidence admissible against one conspirator properly admitted against co-conspirator), *cert. denied,* 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991). This motion was denied.

### H. Motion to Dismiss the Second Superseding Indictment Due to Misuse of Grand Jury

▮ Nicholas Bissell sought to dismiss the Second Superseding Indictment on ground that the Government misused the Grand Jury by issuing a subpoena, dated 9 November 1995, (the "Subpoena") to Henry E. Rzemieniewski ("Rzemieniewski"). Exhibit B (Subpoena) to Belsole Cert. Rzemieniewski is an attorney with offices in Somerville, New Jersey who had handled real estate matters for Defendants. *Id.*, ¶ 2.

The Subpoena demanded production of "[a]ny and all records relating to loan, equity reserve accounts and/or real estate closings done for Nicholas L. Bissell or Barbara J. Bissell." *Id.*, Exhibit B. Counsel indicated the subpoenaed documents "are primarily closing documents with respect to the financing of [D]efendants' home and an investment property in Bridgewater Township." *Id.*, ¶ 5. The original return date of the Subpoena, 23 November 1995 (Thanksgiving) was changed to 23 December 1995. *Id.*, ¶ 4.

Nicholas Bissell argued the relevant documents concerned transactions Defendants carried out "primarily from 1987 through 1992." Second Nicholas Bissell Moving Brief at 3. Nicholas Bissell argued Special Agent Gary E. Berrigan ("Berrigan") of the Federal Bureau of Investigation ("FBI") served the subpoena. *Id.* at 4.

▮ As Nicholas Bissell argued, Second Nicholas Bissell Moving Brief at 5, a prosecutor cannot use a grand jury to gather additional evidence in a forthcoming trial against a defendant following his or her indictment. *Resolution Trust Corp. v. Thornton,* 41 F.3d 1539, 1547 (D.C.Cir.1994); *United States v. Phibbs,* 999 F.2d 1053, 1077 (6th Cir.1993), *cert. denied,* 504 U.S. 1119, 114 S.Ct. 1070, 1071, 127 L.Ed.2d 389 (1994); *United States v. Dise,* 763 F.2d 586, 593 (3d Cir.), *cert. denied,* 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 341 (1985); *In re Grand Jury Proceedings,* 632 F.2d 1033, 1041 (3d Cir.1980) ["*Johanson* "]. Nonetheless, a grand jury is free to continue a good-faith investigation into other charges against an indicted individual. *Dise,* 763 F.2d at 593 (citing *Johanson,* 632 F.2d at 1041).

▮ "In the absence of a contrary factual showing, the grand jury proceedings are entitled to a presumption of lawfulness and regularity." *Johanson,* 632 F.2d at 1041. A defendant who alleges such inappropriate use of a grand jury bears the burden of demonstrating "that the sole or dominant purpose of seeking the evidence post indictment is to prepare for the pending trial." *Id.*

Nicholas Bissell argued the Government improperly used the Grand Jury to gather additional evidence for trial. In support of this assertion, Nicholas Bissell argued the Government had previously obtained all of his financial records, Second Nicholas Bissell Moving Brief at 2; Belsole Cert., Exhibit D, that the Subpoena was "directed at precisely the kind of documents that the [G]overnment would expect to contain the information necessary to satisfy its proofs at trial," *id.* at 7, and that the subpoenaed documents concern financial transactions between 1987 and 1992, the same time frame for acts for which he has already been indicted. *Id.* As additional support for this argument, Nicholas Bissell contended Berrigan served the Subpoena and had been involved with the underlying investigation since the outset. *Id.* at 8. Further, he argued that "the timing and other attendant circumstances" surrounding issuance of the Subpoena warrant suspicion. *Id.*

"[A] good faith inquiry into other charges within the scope of the grand jury's lawful authority is not prohibited even if it uncovers further evidence against an indicted person." *Johanson,* 632 F.2d at 1041. In the instant case, the Grand Jury's investigation was not complete at the time the Subpoena was issued. In fact, the Indictment was twice amended since Nicholas Bissell filed this motion which indicated the Grand Jury continued its investigation following the filing of the Indictment.

The relief sought, dismissal of the Indictment, was not warranted. Defendants failed to support their argument for such relief by citation to authority. The cases relied upon by Defendants were distinguishable and, in any case, did not support this extreme remedy.

For example, Nicholas Bissell relied upon *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 30 (2d Cir.1985). In *Simels*, the Grand Jury had returned a superseding indictment on 10 October 1984. *Id.* at 27. A week later, on the Government's motion, the district court issued a subpoena to defense counsel "commanding that he produce for use at trial" documents relating to his legal fees. *Id.* at 28. The subpoena provoked opposition. *Id.* at 28.

The return of the subpoena was subsequently adjourned; on 3 January 1985, however, defense counsel received a grand jury subpoena seeking the same information. *Id.* Importantly, the grand jury's investigation in *Simels* was apparently completed. The Second Circuit observed not a single witness was called before the grand jury between 10 October 1984 and 29 January 1985 and, therefore, the argument the evidence sought by the subpoena was part of an active investigation was weak. *Id.* at 30. Accordingly, the Second Circuit quashed the grand jury's subpoena. *Id.*

Nicholas Bissell demonstrated no basis for the dismissal of the Indictment. Although the Government had offered to submit a *Schofield* affidavit, 12 January 1996 Letter Brief at 4, a review of the facts indicated that was not necessary. The Grand Jury Motion was denied.

I. *Motion to Require Law Enforcement Officers to Preserve Rough Notes of Investigation and Relevant Matters*

Barbara Bissell sought discovery of the rough notes taken by Government agents "of briefings, conversation, or interviews" in the course of the investigation leading to the instant matter. Barbara Bissell Moving Brief at 19. In addition to notes drafted by Federal investigators, Barbara Bissell sought any such notes taken by other law enforcement officers, including local, county, state and "'ethics entities.'" *Id.;* Barbara Bissell Reply Brief at 5 (citing *United States v. Ramos*, 27 F.3d 65 (3d Cir.1994)).

"[T]he [G]overnment must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced." *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Similarly, in *Ramos*, the Circuit indicated the Government must keep rough notes by interviewing officers and rough drafts of reports of agents "'so that the trial court can determine whether the notes should be made available to [Defendants] under ... *Brady* ... or the Jencks Act.'" 27 F.3d at 68 (quoting *United States v. Vella*, 562 F.2d 275, 276 (3d Cir.1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978)); *see Vella*, 562 F.2d at 275–76 ("To avoid future misunderstandings, we specifically adopt the precepts announced in *United States v. Harrison*, 524 F.2d 421 (D.C.Cir. 1975), as the law in this circuit, to-wit, the rough interview notes of ... agents should be kept and produced so that the trial court can determine whether the notes should be made available to the appellant under the rule of [*Brady* ], or the Jencks Act.").

The Government asserted it "ha[d] already directed the [F]ederal agents to preserve their rough notes" and "[n]o other agents, local or state, were involved in the investigation of the charges...." Opposition Brief at 92. Because the Government represented it had and would comply with its obligations under *Ramos* and *Ammar*, the motion to preserve rough notes and reports was denied as moot. *See Giampa*, 904 F.Supp. at 290 (citing *Eisenberg*, 773 F.Supp. at 692). Defendants were entitled to such notes to the extent the substance constituted Jencks or *Brady* material. *See Ramos*, 27 F.3d at 68.

J. *Motion to Bar Introduction of Co-Conspirator Statements Pursuant to Rule 801(d)(2)(E)*

Barbara Bissell sought an order to bar the introduction of co-conspirators' statements pursuant to Rule 801(d)(2)(E), or, in the alternative, a pretrial hearing to determine the admissibility of any such statements. Barbara Bissell Moving Brief at 20; Barbara Bissell Reply Brief at 5.

Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Excluded from the definition of hearsay, however, is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

■ To apply the Rule 801(d)(2)(E) exemption to the hearsay rule, a court must determine, by a preponderance of the evidence, that a conspiracy existed between the declarant and the party against whom the statement is offered and the statement sought to be admitted was made during the course of and in furtherance of the conspiracy. *McGlory*, 968 F.2d at 333 (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir.), *cert. denied*, 502 U.S. 956, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991)).

■ In cases where it is difficult or impossible for the Government to prove the existence of the conspiracy before seeking to admit the co-conspirator's statement, the co-conspirator's statement may be admitted conditionally, "subject to the Government's obligation to prove the conspiracy's existence and each conspirator's participation therein before the close of the Government's case." *Giampa*, 904 F.Supp. at 286 (citing *Gambino*, 926 F.2d at 1360–61; *United States v. De Peri*, 778 F.2d 963, 981 (3d Cir.1985); *Ammar*, 714 F.2d at 245–47; *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 820–21 (3d Cir.1982), *cert. denied*, 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983); *United States v. Continental Group, Inc.*, 603 F.2d 444, 456 (3d Cir.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980)).

■ " '[T]he control of the order of proof at trial is a matter committed to the discretion of the trial judge.' " *Giampa*, 904 F.Supp. at 286 (quoting *Gambino*, 926 F.2d at 1360). Count 23 of the Second Superseding Indictment alleged that, from 1 January 1991 to 28 September 1995, Defendants conspired to evade payment of Federal income taxes. Second Superseding Indictment,

¶¶ 1–13, at 29–32. No other counts in the Second Superseding Indictment concerned conspiracy. Barbara Bissell's only stated reason for addressing Rule 801(d)(2)(E) issues before trial was a lack of knowledge "as to who any other co-conspirators may be and what testimony they intend to give." Barbara Bissell Moving Brief at 27.

■ The danger in admitting a statement pursuant to Rule 801(d)(2)(E) is the potential for undue prejudice to a defendant before the jury hears independent evidence of the conspiracy. *Giampa*, 904 F.Supp. at 286 (citing *Gambino*, 926 F.2d at 1360). The conspiracy alleged in the Second Superseding Indictment was not complex. The possibility of undue prejudice could be addressed by a limiting instruction at the appropriate time. Rulings concerning Rule 801(d)(2)(E) material were deferred until trial. Accordingly, this motion was denied.

K. *Motion to Require the Government to Indicate Any Evidence it Intends to Introduce at Trial Pursuant to Rule 404(b)*

■ Barbara Bissell sought an order to compel the Government to provide pretrial disclosure of any material it intended to introduce into evidence pursuant to Rule 404(b). Barbara Bissell Moving Brief at 29. Rule 404(b), which was amended effective 1 December 1991, provides, in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, *provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.*

Fed.R.Evid. 404(b) (emphasis added to amended material). The "reasonable notice" requirement of Rule 404(b) does not specify a time frame for such disclosure. *See Giampa*, 904 F.Supp. at 283 (citing *United States v.*

*Kern,* 12 F.3d 122, 124 (8th Cir.1993) (holding notice fourteen days before trial sufficient); *United States v. Evangelista,* 813 F.Supp. 294, 302 (D.N.J.1993) (holding pretrial notice of ten business days sufficient); *United States v. Williams,* 792 F.Supp. 1120, 1133 (S.D.Ind.1992) (ordering notice no later than ten days prior to trial); *United States v. Alex,* 791 F.Supp. 723, 729 (N.D.Ill.1992) (ordering seven days pretrial notice)).

The Government indicated it was aware of its responsibilities pursuant to the amended version of Rule 404(b) and had agreed to provide "reasonable notice in advance of trial of the general nature of any evidence of other crimes, wrongs, or acts contemplated by Rule 404(b)...." Opposition Brief at 94. The motion was denied.

L. *Motion to Require the Government to Identify any Matters of Which it Sought to Have the Court Take Judicial Notice and to Produce Charts or Summaries Intended to Use at Trial*

Barbara Bissell sought an order directing the Government to identify any matters of which it sought to have the court take judicial notice and to produce charts or exhibits it intended to present at trial. Barbara Bissell Moving Brief at 32. The Standing Order for Discovery and Inspection of the United States District Court for the District of New Jersey, ¶ 4 (the "Standing Order") [36] requires the Government to permit inspection of all such exhibits thirty days prior to the commencement of the trial. The Government agreed to comply with the Standing Order and to identify matters of which it sought judicial notice. Opposition Brief at 95. Accordingly, the motion was denied. Neither of the Defendants asserted non-compliance by the Government at any of the status conferences held before trial.

M. *Motion to Exclude or Redact Bruton Material*

Since the Omnibus Motions were filed, Defendants and the Government resolved the *Bruton* issues. 9 Apr. 1996 Tr. at 2; 15 Apr. 1996 Tr. at 3. Accordingly, the motion to exclude or redact *Bruton* material was denied as moot.

*Pre–Trial Conclusion*

For purposes of this Opinion, the pre–trial motions of each of Defendants were considered, as requested. The Omnibus Motions were denied in all respects and the Grand Jury Motion was denied.

*Sentencing*

A. *Sentencing Guideline Calculation*

1. *Background*

On 31 May 1996, Defendants were convicted by a jury of all counts charged against them in the Second Superseding Indictment. The sentencing of Defendants was originally scheduled for 6 September 1996.[37]

On 8 August 1996, the Government submitted the Sentencing Memorandum. The Sentencing Memorandum contains the Govern-

---

**36.** The substance of the Standing Order is nearly identical to the discovery order, filed in this matter on 3 October 1995.

**37.** A number of submissions were considered during the sentencing process.

The Department of Probation prepared a draft presentence investigation report for Barbara Bissell (the "Barbara Bissell Draft Presentence Investigation Report"). The parties were then given the opportunity to provide objections to the Barbara Bissell Draft Presentence Investigation Report to the Department of Probation. Barbara Bissell submitted: Barbara Bissell's Response to the Draft Presentence Report ("Barbara Bissell Sen. Objections"), dated 28 October 1996. The Government submitted: letter of Stuart Rabner, (the "Barbara Bissell Gov't Sen. Objections"), dated 22 October 1996. The Department of Pro-

bation subsequently prepared the final presentence investigation report for Barbara Bissell (the "Barbara Bissell Presentence Investigation Report").

The Government also submitted the Sentencing Memorandum (the "Sentencing Mem."), dated 8 August 1996; letter of Perry A. Carbone, in reply to the Barbara Bissell Sentencing Mem. Opposition (the "Barbara Bissell Sentencing Mem. Reply"), dated 13 October 1996.

Barbara Bissell submitted: letter of Rita E. Donnelly, in support of downward departure from the Guidelines (the "Downward Departure Brief"); letter of Rita E. Donnelly, in response to the Sentencing Mem. (the "Barbara Bissell Sen. Mem. Opp."), dated 6 November 1996; Letter Memorandum In Lieu of Reply Brief and Motion for Downward Departure (the "Downward Departure Reply"), dated 17 November 1996.

ment's understanding of the facts proven at trial and proposed a calculation under the United States Sentencing Guidelines (the "Guidelines") for Defendants.

On 28 October 1996, Barbara Bissell filed a motion for downward departure from the Guidelines ("the Motion for Downward Departure"). By a letter to the court, dated 12 November 1996, the Government responded to the Motion for Downward Departure.

Because of the complexity of the instant case and the numerous counts upon which Defendants were convicted, the Department of Probation's draft presentence investigation reports were delayed. The sentencing of Defendants was accordingly adjourned. The Barbara Bissell Draft Presentence Investigation Report was not distributed until 16 October 1996.

Although providing the Department of Probation with objections and comments to the Draft Presentence Investigation Reports, Defendants did not timely respond to the Sentencing Memorandum. Accordingly, on 31 October 1996, an order was filed directing, among other things, that Defendants file responses to the Sentencing Memorandum, in its entirety, on or before 8 November 1996. Defendants subsequently responded to the Sentencing Memorandum.[38]

On 15 November 1996, the final presentence investigation report for Barbara Bissell (the "Barbara Bissell Presentence Investigation Report") was distributed. The Barbara Bissell Presentence Investigation Report identifies the offenses of which she was convicted and details, at length, the factual background for these offenses. The Barbara Bissell Presentence Investigation Report further provides sentence calculations under the Guidelines. These sentence calculations are based upon Barbara Bissell's criminal history and the characteristics of her offenses, as well as other factors.

The complex nature of the instant case, the numerous objections to the Draft Presentence Investigation Reports and the Motion for Downward Departure, require the sentencing of Barbara Bissell be addressed in this opinion. This requires a discussion of the appropriate Guideline sentence range and the merits of the Downward Departure Motion.

■ The resolution of the myriad of issues raised by the Government and Barbara Bissell regarding sentencing necessarily requires the resolution of a number of factual issues. The factual matters pertinent to the application of the Guidelines must be established by a preponderance of the evidence. *United States v. Brothers,* 75 F.3d 845, 848 (3d Cir.1995) (citing *United States v. Miele,* 989 F.2d 659, 663 (3d Cir.1993); *United States v. McDowell,* 888 F.2d 285, 290 (3d Cir.1989)); *see e.g., United States v. James,* 78 F.3d 851, 858 (3d Cir.) (Government failed to prove by preponderance of evidence cocaine at issue was crack cocaine for Guideline enhancement), *cert. denied,* — U.S. —, 117 S.Ct. 128, 136 L.Ed.2d 77 (1996); *United States v. DeLeon–Rodriguez,* 70 F.3d 764,

**38.** Defendants were ordered to respond to the Sentencing Memorandum so that the Government's calculations and arguments would not go unaddressed. Counsel for Barbara Bissell, nevertheless, argued she should not be required to respond to the Sentencing Memorandum. *See* letter of Rita E. Donnelly, dated 31 October 1996. Counsel argued the Sentencing Memorandum is improper and should have been "either returned to the [G]overnment or discarded." *Id.* Counsel based her argument that Barbara Bissell should not be required to respond to the Sentencing Memorandum upon the standing order regarding Guideline sentencing (the "Standing Order"), which sets forth the District of New Jersey's sentencing procedure. She construes the Standing Order as forbidding the submission of the Sentencing Memorandum, describing it as a "preemptive strike." *See* letter of Rita E. Donnelly, dated 31 October 1996.

The Standing Order does not address the submission of Government sentencing memoranda. Accordingly, these submissions are neither forbidden nor discouraged. Such sentencing memoranda are useful to the Department of Probation in preparing its presentence investigation reports.

In the instant case, Defendants were ordered to respond to the Sentencing Memorandum because of concern that the Government's calculations and arguments were not being addressed by defense counsel. The response was ordered so the Defendants would have an adequate opportunity to present their objections to the facts and calculations set forth in the Sentencing Memorandum. It is ironic that counsel for Barbara Bissell would argue she not be required to respond.

767 (3d Cir.1995) (defendant bears the burden of establishing by a preponderance of the evidence he or she has accepted responsibility for Guideline adjustment), *cert. denied,* — U.S. ——, 116 S.Ct. 1343, 134 L.Ed.2d 492 (1996).

### 2. *The Sentencing Hearing*

Barbara Bissell's sentencing hearing (the "Sentencing Hearing") was held on 6 December 1996.[39] At the Sentencing Hearing, the parties were given the opportunity to address their objections to the Presentence Investigation Report. Findings regarding these objections and related factual disputes were then made.

Oral argument was then heard on Barbara Bissell's various downward departure motions. At the conclusion of oral argument, all of these motions, with the exception of Barbara Bissell's motion for a downward departure because of her family circumstances, were denied. As indicated below, because of the unique circumstance of the public suicide of Nicholas Bissell, a two-level downward departure from the Guidelines was appropriate.

The Government was heard on its motion for a downward departure pursuant to U.S.S.G. § 5K1.1 (the "5K1.1 Motion"). Sentencing Tr. at 20–26. As indicated below, the 5K1.1 Motion was without merit and was rejected. *See id.* at 27–28.

The Government raised the issue of restitution. The Government asked that Barbara Bissell be ordered to pay restitution in the amount of $103,000. Sentencing Tr. at 33. As indicated below, after hearing argument on this issue, restitution in the amount of $103,000 was ordered, to be taken out of any monies "that could be derived from any commercial venture resulting from this matter that [Barbara Bissell] comes into, whether it be a book, movie, interview or anything ... along those lines." *Id.* at 47.

Before sentence was imposed, Barbara Bissell was provided the opportunity to address the court. As indicated below, after all matters relating Barbara Bissell's sentencing were resolved, a sentence of 27 months imprisonment was imposed.

### 3. *Sentencing Recommendations*

The Barbara Bissell Presentence Investigation Report presents a total offense level of 18 and a criminal history category of I under the Guidelines for sentencing purposes. The criminal history category of I has been reached because Barbara Bissell has no criminal history. Barbara Bissell Presentence Investigation Report, ¶¶ 145–47. The total offense category of 18 was calculated based upon a number of factors which are discussed below.

#### a. *Convictions and Grouping Rules*

As indicated, Barbara Bissell was convicted on all counts charged against her in the Second Superseding Indictment. These included:

Counts 12–16: Mail Fraud
18 U.S.C. § 1341—5 years/$250,000 fine, a class D Felony

Count 23: Conspiracy to Defraud the IRS
18 U.S.C. § 371—5 years/$250,000 fine, a class D Felony

Counts 24–27: Tax Evasion
26 U.S.C. § 7201—5 years/$250,000 fine, a class D Felony

Counts 28–30: Subscribing to a False Income Tax Return
26 U.S.C. § 7206(1)—3 years/$250,000 fine, a class E Felony

Barbara Bissell Presentence Investigation Report at 1.

Pursuant to U.S.S.G. § 3D1.2, "all counts involving substantially the same harm [are] grouped together in a single group." *Id.* Accordingly, for sentencing purposes, counts 12 through 16, mail fraud, were grouped in one group ("Group One") and 23 through 30, tax evasion, were grouped in a second group ("Group Two"). Groups One and Two reflect separate harms and required incremental

---

**39.** References to the transcript of the Sentencing Hearing will be cited as: Sentencing Hearing Tr. at [page].

punishment. *See* U.S.S.G. 3D1.4; Barbara Bissell Presentence Investigation Report, ¶ 118.

### b. *Group One—Mail Fraud Involving The Bedminster Station (Counts 12–16)*

Pursuant to U.S.S.G. § 3D1.2(d), closely related counts are grouped into a single group "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to confer such behavior." *Id.* Accordingly, counts 12 through 16, which involve Defendants' mail fraud scheme in connection with the operation of the Bedminster Station, were grouped together for sentencing purposes. The Department of Probation presented the following offense level computation for Group One:

1. Base Offense Level: The United States Sentencing Commission Guideline for violation of 18 U.S.C. § 1341 is found in U.S.S.G. § 2F1.1(a) and calls for a base offense level of 6. (6)

2. Specific Offense Characteristic: Pursuant to U.S.S.G. § 2F1.1(b)(1)(I), the aggregate amount of fraud, which is grouped under Section 3D1.2, exceeded $200,000, but was less than $350,000, resulting in an increase of eight levels. (+8)

3. Specific Offense Characteristic: The offense involved more than minimal planning, resulting in an increase of two levels, pursuant to Section 2F1.1(b)(2)(A). (+2)

4. Victim–Related Adjustments: None (0)

5. Adjustments for Role in the Offense: None. (0)

6. Adjustment for Obstruction of Justice: None. (0)

 Adjusted Offense Level (Subtotal): (16)

### c. *Group Two—Tax Fraud (Counts 23–30)*

Group Two's counts were grouped largely on the basis of total amount of tax loss, pursuant to U.S.S.G. § 3D1.2(d). The Department of Probation presented the following offense level computation for Group Two:

1. Base Offense Level: The United States Sentencing Commission Guideline for violation of 26 U.S.C. § 7201 is found in U.S.S.G. § 2T[4].1(I) and calls for a base offense level of 14, based on an aggregate tax loss between $70,000 and $120,000. (14)

2. Specific Offense Characteristic: Pursuant to U.S.S.G. § 2T1.1(b)(2), sophisticated means were used to impede the discovery of the existence and the extent of the offense, resulting in an increase of two levels. (+2)

3. Victim–Related Adjustments: None. (0)

4. Adjustments for Role in the Offense: None. (0)

5. Adjustment for Obstruction of Justice: None. (0)

 Adjusted Offense Level (Subtotal): (16)

### d. *Multiple–Count Adjustment*

Pursuant to U.S.S.G. § 3D1.4 ("Section 3D1.4"), the Department of Probation determined the combined offense level as follows.

| | | |
|---|---|---|
| Adjusted Offense Level for Group One | (16) | (1) |
| Adjusted Offense Level for Group Two | (16) | (1) |
| Total Number of Units | | (2) |
| Greater Adjusted Offense Level | | (16) |
| Increase in Offense Level: | | (2) |
| Combined Adjusted Offense Level: | | (18) |
| Adjustment for Acceptance of Responsibility | | (0) |

The Department of Probation recommends no adjustment for acceptance of responsibility for Barbara Bissell.

| | |
|---|---|
| Barbara Bissell Total Offense Level: | (18) |

### B. *Objections*

As indicated, following the distribution of the Barbara Bissell Draft Presentence Investigation Report, the parties were given the opportunity to provide objections. To the extent that these objections affected Barbara Bissell's sentencing, they were considered individually and collectively.

#### 1. *Government Objection*

The Government offered only one objection to the Barbara Bissell Draft Presentence Investigation Report. The Government argued "[t]he Guidelines calculations for the tax fraud counts (counts 23–30) should include a 2–point enhancement under U.S.S.G. [§] 2T1.1(b)(1) relating to income derived

from criminal activity) (sic)." Barbara Bissell Gov't Sen. Objections at 1.

Section 2T1.1(b)(1) provides:

If the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

U.S.S.G. § 2T1.1(b)(1) (emphasis in original).

The Government argued an adjustment should be made pursuant to Section 2T1.1(b)(1) because Barbara Bissell failed to report "more than $10,000 in diverted or skimmed income from [Defendants' mail fraud scheme] each year." Government Barbara Bissell Sen. Objections at 1. The Government relied upon *United States v. Astorri*, 923 F.2d 1052, 1055 (3d Cir.), for support. *Id.*

In her response to the Government's Sentencing Memorandum, Barbara Bissell "dispute[d] [the Section 2T1.1(b)(1) enhancement] as double counting because it [was] already used to reach the offense level. Additionally, [she argued that she was] not liable for income in excess of $10,000 in one year from criminal activity." Barbara Bissell Sentencing Mem.Opp. at 6.

The Government established at trial that Barbara Bissell failed to report the proceeds of Defendants' mail fraud scheme. These proceeds were proven to exceed $10,000 in diverted and skimmed income each year. Accordingly, the only remaining question was whether a Section 2T1.1 enhancement would be improper "double-counting" under the Guidelines.

In *Astorri*, the defendant pleaded guilty to one count of wire fraud in connection with a fraudulent stock investment scheme and one count of tax evasion for failing to declare the illegal income from the scheme. 923 F.2d at 1054. At sentencing, the district court departed upward two-levels, in part, pursuant to Section 2T1.1. *Id.* On appeal, the defendant argued "the fraud count embodies conduct treated as a specific offense characteristic under the tax evasion offense and,

therefore, [U.S.S.G. §] 3D1.2(c) requires grouping of the two counts." *Id.* at 1056. The court rejected this argument. It observed "the fraud ... [G]uideline does not address concealment of criminal activity or a failure to report criminally-derived income." *Id.* The court further observed that U.S.S.G. § 3D1.2(c) targets "conduct" that is treated as a specific offense characteristic in or adjustment to the applicable guideline. *Id.*

The *Astorri* court determined the tax evasion and fraud counts were distinct. The court found support for its conclusion in the background commentary to Section 2T1.1:

Failure to report criminally-derived income is included as a factor for deterrence purposes. Criminally-derived income is generally difficult to establish, so that the tax loss in such cases will tend to be substantially understated.

*Astorri*, 923 F.2d at 1056–57 (quoting Background Commentary, U.S.S.G. § 2T1.1). The court held the Commission had included "this specific offense characteristic to deter tax evasion. To include this specific offense characteristic as 'conduct' in the fraud count negates its separate inclusion within the tax evasion guideline." *Id.* at 1057; *see United States v. Box*, 50 F.3d 345, 359 (5th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 309, 133 L.Ed.2d 213 (1995).

In *Box*, the defendant was convicted of extortion and conspiracy to interfere with interstate commerce by extortion. 50 F.3d at 348. On appeal, the defendant argued, among other things, that "the two-level increase in his offense level under [U.S.S.G.] § 2T1.3(b)(1) [40] 'amount[ed] to a doubling up of the guideline levels for conduct already contemplated under the Extortion charges.'" *Id.* The Fifth Circuit rejected this argument:

The [Guidelines] do not prohibit all double counting.... Double counting is prohibited only if the particular guidelines at issue forbid it.... Even assuming *arguendo* that there was double counting, we

---

40. U.S.S.G. § 2T1.3 was deleted from the Guidelines and its provisions were consolidated with Section 2T1.1, effective 1 November 1993. *See* U.S.S.G., Appendix C, amendment 491.

have found no express language in the guidelines prohibiting this enhancement. *Box,* 50 F.3d at 359.

■ In the instant case, the offense characteristics set forth in Section 2T1.1(b)(1) did not constitute conduct under the mail fraud charges. As the Government pointed out, "the tax counts and the fraud counts have not been grouped under [U.S.S.G.] § 3D1.2." Barbara Bissell Gov't Sen. Objections at 1. Accordingly, enhancing Barbara Bissell's base offense levels for the tax counts by two-levels for criminally derived income under Section 2T1.1(b)(1) did not constitute inappropriate double counting. *See* U.S.S.G. §§ 2T1.1(a) & 2T4.1; *Astorri,* 923 F.2d at 1056–57. The offense level for Group Two was increased two-levels pursuant to Section 2T1.1(b)(1).

### 2. *Barbara Bissell's Objections*

#### a. *Tax Loss Calculations*

■ The parties agreed that the appropriate tax loss figure, for the purposes of sentencing, is $73,724. Letter of Perry Carbone, dated 2 December 1996. Barbara Bissell, however, disputed the calculation of tax loss to the Government resulting from her conduct. "Barbara Bissell [did] not contest the total tax loss. She contest[ed] the amount of tax loss attributable to her...." Barbara Bissell Downward Departure Reply at 7.

Barbara Bissell maintained she was not responsible for the portion of the tax loss resulting from the falsely inflated accounts payable and the cash deposited into Nicholas Bissell's account because this behavior was not reasonably foreseeable to her. She argued her tax loss figure should be reduced by the amount of the inflated accounts payable for 1991 through 1993. Barbara Bissell Sen. Objections at 2.

Barbara Bissell argued she could not have reasonably foreseen that Nicholas Bissell and Wagner would inflate the accounts receivable for the Bedminster Station in order to defraud the IRS. *Id.* She argued she was not aware of this scheme and she neither willfully participated in the scheme, nor foresaw that it would happen and her liability, there-fore, should be reduced to $54,000. *Id.* Finally, Barbara Bissell argued she relied upon her accountant and husband.

A defendant's base offense level is "determined on the basis of ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction ... or in the course of attempting to avoid detection or responsibility for that offense...." U.S.S.G. § 1B1.3(a)(1)(B).

> In the case of jointly undertaken criminal activity ... a defendant is accountable for the conduct (acts and omissions) of others that was both:
>
> (i) in furtherance of the jointly undertaken criminal activity; and
>
> (ii) reasonably foreseeable in connection with that criminal activity.
>
> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant ... is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others ... the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake.... The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision....

U.S.S.G. § 1B1.3, comment. (n.2).

The Circuit has held:

> Whether an individual may be accountable ... [for the conduct of others] depends upon the degree of the defendant's involvement, courts must consider whether the amounts [attributable] to the defendant's co-conspirators were ... "in furtherance of the ... jointly undertaken ... activity" were "within the scope of the defendant's agreement" and were reasonably foreseeable in connection with the criminal activi-

ty of the defendant agreed to undertake.... [A] searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendant's sentence accurately reflects his or her role.

*United States v. Collado,* 975 F.2d 985, 995 (3d Cir.1992).

At trial, the evidence proved Barbara Bissell was very much involved with the tax evasion scheme. Barbara Bissell participated in each of the five methods of tax evasion employed by Defendants. She skimmed money from the Bedminster Station cash receipts. She charged personal expenses on the Bedminster Station's business account. Barbara Bissell was aware or should have foreseen Wagner falsified the accounts payable. Barbara Bissell signed the Federal corporate income tax returns for Budco for the years 1991 through 1993. Trial Tr. at 1360. She also signed Defendants' joint income tax returns Forms 1040 for 1990–1994. *Id.* at 1361. She, moreover, signed representation letters (the "Representation Letters") that were sent to Wagner and which the overstated the accounts payable for the Bedminster Station. *Id.* at 1406–11. In fact, Barbara Bissell signed a Representation Letter by which Defendants purported to personally assume the Bedminster Station's 1992 fictitious accounts payable of $74,000. *Id.* at 1409.

Even if Barbara Bissell did not fully understand how accounts payable affect tax liability in a given year, she fully understood she was signing returns revealing large losses for each year. Barbara Bissell signed the 1992 tax returns for the Bedminster Station that falsely declared her to be 100 percent owner so that Defendants would receive the tax benefit of the station's loss. Trial Tr. at 1423. Barbara Bissell, as the Bedminster Station bookkeeper, was involved in paying the station's employees off the station's books in order to avoid tax liability. *Id.* at 1445.

Barbara Bissell's argument that she relied upon her husband and accountant was made to the jury and rejected.[41] In her closing, counsel argued:

Barbara Bissell relied on the guidance and the counseling or just on the direction of what her husband told her to do. There is no credible evidence in this record to the contrary, none.

Barbara Bissell relied on the fact that a well-respected accounting firm in Somerset County was going to take all of this work and figuring or whatever had to be done off her shoulders, she didn't have to do it. And when her husband brought documents home and said sign it (sic), she signed it. Why wouldn't she? Both of these individuals had far superior knowledge of the material than she had.

Trial Tr. at 2788. The jury necessarily rejected this argument when it found Barbara Bissell guilty of all counts charged against her in the Second Superseding Indictment. An independent review of this argument and the evidence yields the same result.

Barbara Bissell's conduct, described above, was in furtherance of Defendants' jointly undertaken activity to evade the payment of taxes. The evidence presented at trial demonstrated Barbara Bissell knowingly and voluntarily participated in each of the five methods used by Defendants described above. Barbara Bissell's argument that she could not reasonably foresee that Nicholas Bissell and Wagner would inflate the accounts receivable for the Bedminster Station is contrary to the weight of the evidence. Accordingly, her argument for a reduction of the tax loss was rejected.

b. *Loss from the Bedminster Station Fraud*

The parties agreed upon the amount of loss from the Bedminster Station as $141,000 in skimmed cash and $65,000 in personal expenses, paid for by the station, for a total loss of $206,000. Letter of Perry Carbone, dated 2 December 1996.

▮▮▮ Barbara Bissell objected to the aggregate amount of fraud which is grouped together in Group One pursuant to U.S.S.G. § 3D1.2 and determined with reference to

---

**41.** This argument was also made in the Motion for a Downward Departure. *See supra.*

U.S.S.G. § 1B1.3, comment. (n.1 & n.2). Barbara Bissell argued her liability should be limited to $32,750 and, therefore, only a four-level increase should be applied to her sentence, pursuant to U.S.S.G. § 2F1.1(b)(1)(E), as opposed to eight-levels described in the Barbara Bissell Presentence Investigation Report. Barbara Bissell Sen. Objections at 4.

Barbara Bissell argued her liability should be first reduced by any cash that went into her husband's account and that the sum of cash that went into her account, as well as the personal, expenses, should be reduced by one-half to reflect her partnership agreement with Thornburg. Barbara Bissell Sen. Objections at 4.

Barbara Bissell arrived at the $32,750 figure with the following argument:

> Barbara Bissell should be accountable for one half of the $500 she took that belonged to Buddy Thornburg, and one half of the $65,000 that she diverted to the payment of personal expenses.... Since half of this money belonged to Buddy [Thornburg] she defrauded him of $250.00 + $32,500, or $32,750.

Barbara Bissell Sen. Objections at 4.

Barbara Bissell argued even if the unexplained cash deposits that were proven to have been made to her savings account are counted in determining the aggregate fraud, a four-level increase for Group One should still result.

> If the $13,851 representing the unexplained cash deposits that were deposited in the Barbara Bissell savings account is counted and divided in half to separate out Buddy Thornburgs (sic) share, and the remaining $6,925.50 is added to the $2,750 noted above, the total $39,675.50 would still call for an increase of 4 points to a level of 10.

Barbara Bissell Sen. Objections at 4.

In her response to the Sentencing Memorandum, Barbara Bissell additionally argued:

> On the other side of the ledger, Barbara Bissell should be credited for her work as bookkeeper for the four years. She should have received at least $15,000 per year in salary which is not factored in at all. This would amount to approximately $60,000 over the four year period. Certainly Buddy Thornburg did not expect her to work for nothing and thereby enrich his share of profits. Personal expenses paid should be offset by the salary Barbara Bissell should have received.

Barbara Bissell Sen.Mem.Opp. at 1–2.

This argument is nonsense. There was never an agreement between Defendants and Thornburg that Barbara Bissell would receive compensation for her bookkeeping. Barbara Bissell, moreover, did not report this "compensation" on her income tax returns. Finally, she did not provide a basis for her argument she was entitled to $15,000 per year. As a dishonest employee who stole from the business, Barbara Bissell was not entitled to compensation based upon the "value" of her work.

The evidence at trial demonstrated Barbara Bissell, along with Nicholas Bissell, stole money from the Bedminster Station and Thornburg.[42] The conduct of Nicholas Bissell relating to the $206,000 loss was in furtherance of Defendants' jointly undertaken activity. The evidence demonstrated Nicholas Bissell's conduct was within the scope of Barbara Bissell's criminal agreement and was reasonably foreseeable to Barbara Bissell. *See Collado,* 975 F.2d at 995.

Barbara Bissell was not entitled to a one-half reduction reflecting Thornburg's share. Throughout each of the years Defendants stole money from the Bedminster Station, they represented to Thornburg the station was losing money and that there were no profits for distribution. Defendants caused the filing of tax returns each year representing that the business was losing money.

The true measure of loss is the amount of money stolen from the station. "Loss" is defined in the Guidelines, U.S.S.G. § 2B1.1, comment. (n.2), as "the value of the property taken, damaged or destroyed." *Id.* The

---

**42.** The evidence at trial proved Barbara Bissell, in addition to charging and paying for personal expenses with Bedminster Station funds, accompanied Nicholas Bissell on weekends and participated in the cash skimming.

"loss" from the fraud was not measured by Barbara Bissell's personal gain but rather was the actual loss suffered by her victim. *See United States v. Maurello*, 76 F.3d 1304, 1311 (3d Cir.1996). The aggregate loss resulting from Barbara Bissell's fraud was properly measured by the amount of money stolen from the Bedminster Station; accordingly, her argument the "loss" should be reduced was rejected.

### c. Minor Role in Tax Evasion and Bedminster Fraud

██ Barbara Bissell argued she played a minor role in any fraud scheme or the tax evasion conspiracy and functioned in a "robotic fashion to meet her husband's requests." Barbara Bissell Sen. Objections at 4. She argued she was entitled to a two-point reduction because of her minor role. *Id.*

This argument was without merit. Barbara Bissell, as the bookkeeper for the Bedminster Station, was intimately familiar with the station's finances. She wrote the checks for the personal expenses, she handled the off-the-books payroll, at times she handled the cash that went into her accounts, and she signed all of the false tax returns, S–Corp Election Forms and the Representation Letters.

Barbara Bissell was fully cognizant of her role in both the tax and fraud offenses. Barbara Bissell participated in the instant offenses, taking affirmative steps on numerous occasions to handle cash, write checks and sign false returns. Such behavior did not justify a minor role adjustment.

### d. Sophisticated Means

██ Barbara Bissell argued there should be no increase in the offense calculations for sophisticated means. Barbara Bissell argued she did not "initiate the criminal scheme" and, "[i]n fact, she did not know of the scheme until it was unveiled at trial." Barbara Bissell Sen. Objections at 5. This contention is nonsense; the evidence of Barbara Bissell's criminal conduct was overwhelming.

The evidence at trial demonstrated Barbara and Nicholas Bissell conspired with each other and with Wagner to defraud the Government of taxes for the years 1991 to 1994. Defendants accomplished their scheme using five distinct methods. First, they defrauded the government by skimming cash from the Bedminster station and failing to report the money on their tax returns. Evidence introduced at trial proved Defendants skimmed approximately $141,000.

Second, Defendants charged more than $65,000 in personal expenses on the Bedminster Station business account. Instead of declaring this money as taxable income, they wrote off these personal expenditures as business deductions.

Third, Defendants submitted false business tax returns overstating business expenses. Specifically, Nicholas Bissell directed Wagner to overstate the partnership's accounts payable in order to reduce or eliminate the business's tax liability. *Id.* Because profits and losses of the business were passed on to Defendants' personal returns, this manipulation directly affected their personal tax liability. The Representation Letters were admitted in evidence. As indicated, the Representation Letters, signed by Barbara Bissell, acknowledged that she was aware of the accounts payable figures being used. Barbara Bissell fully understood she was signing returns reporting large losses each year.

Fourth, Defendants misstated their true ownership interest in the Bedminster Station at various times. In 1992, for example, they falsely declared Barbara Bissell was the 100 percent owner of the Bedminster Station, thereby, enabling them to fraudulently declare a purported $34,000 tax loss from the Bedminster Station.

Finally, Defendants defrauded the IRS by paying several workers at the Bedminster Station without withholding payroll or income taxes. To avoid employer taxes, Barbara Bissell halved one employee's hours for tax purposes, declaring half his hours on the books and authorizing payment for the remaining hours off the books. Defendants overlooked wages for other employees as well. Barbara Bissell then provided false payroll information to the accountant each quarter, fraudulently understating the pay-

roll. Those records were used to prepare and file the station's payroll tax returns and to generate W–2 Forms. The evidence at trial proved off-the-books payroll of $28,418 in 1991, $40,753 in 1992, $20,886 in 1993, and $20,994 in 1994.

Defendants' five methods of evasion were sophisticated and designed to impede discovery. Furthermore, the evidence at trial proved Barbara Bissell's active participation in this evasion. Accordingly, Barbara Bissell's argument she did not participate in the sophisticated scheme of evasion was rejected.

### e. *Acceptance of Responsibility*

█ Barbara Bissell pleaded not guilty and was subsequently tried and convicted of the charges brought against her in the Second Superseding Indictment. She nevertheless argued her sentence should be adjusted downward because she had accepted responsibility for her actions.

Barbara Bissell stated that she had "accepted responsibility for her deliberate ignorance of facts of which she should have been aware." Barbara Bissell Sen. Objections at 7. She further argued:

> She mistakenly and carelessly allowed a pattern to develop that she should have challenged. She tried on several occasions to enter a plea but had no information to give to the government and she was under great duress before and during trial not to take any action that would be against her husband. She cooperated in every other respect, stipulating to numeraous (sic) signatures and documents to economize on the Court's time.... She also declined to take the stand and testify in her own behalf.

Barbara Bissell Sen. Objections at 7. Barbara Bissell also pointed to her "exemplary conduct pre and post trial" as evidence of her acceptance of responsibility.

Barbara Bissell did not accept responsibility for her criminal conduct; her comments to the Draft Presentence Report demonstrated she continued to proclaim innocence. Furthermore, her acceptance of responsibility for her "deliberate ignorance of facts," did not reflect a recognition of wrong-doing. Ac-

cordingly, Barbara Bissell's argument her "acceptance of responsibility" should be considered was rejected; it was, and is, utterly without merit.

### f. *Remaining Objections*

Barbara Bissell made numerous objections to the Barbara Bissell Draft Presentence Investigation Report in addition to the objections previously discussed. The remaining objections, however, have either been resolved by the Department of Probation in the Barbara Bissell Presentence Investigation Report or do not affect the Guideline computation. They were not considered for sentencing and accordingly will not be addressed.

### C. *The Motion for Downward Departure*

As indicated, Barbara Bissell moved for a downward departure from the Guidelines, based, in part, upon U.S.S.G. § 5K2.0 ("Section 5K2.0") because of "extraordinary family responsibilities, susceptibility to abuse in prison, and reliance on professionals." Downward Departure Brief at 1. The Motion for Downward Departure was also based upon U.S.S.G. § 5K2.12 ("Section 5K2.12"), Coercion and Duress, and U.S.S.G. § 5K2.13 ("Section 5K2.13"), Diminished Capacity. *Id.*

### 1. *The Standard for Departure from the Guidelines*

"The Sentencing Reform Act of 1984 [ (the "Reform Act") ], as amended, 18 U.S.C. § 3551 *et seq.,* 28 U.S.C. §§ 991–998, made far-reaching changes to federal sentencing." *Koon v. United States,* — U.S. —, —, 116 S.Ct. 2035, 2043, 135 L.Ed.2d 392 (1996). Prior to the Reform Act, a sentencing court "enjoyed broad discretion" over the sentencing of offenders. *Id.* "Th[is] discretion led to perceptions that 'federal judges mete out an unjustifiably wide range of sentences to offenders with similar histories, convicted of similar crimes, committed under similar circumstances.'" *Id.* at — – —, 116 S.Ct. at 2043–44. To address these concerns, Congress created the United States Sentencing Commission (the "Commission") and charged it with developing a comprehensive set of sentencing guidelines. *See id.* at —, 116

S.Ct. at 2044 (citing 28 U.S.C. § 994). "A district judge now must impose on a defendant a sentence falling within the range of the applicable Guideline, if the case is an ordinary one." *Id.*

District courts, however, have not been left completely without discretion. A district court may depart from the applicable Guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see Koon,* —— U.S. at ——, 116 S.Ct. at 2044; *United States v. Rybicki,* 96 F.3d 754, 757 (4th Cir.1996); *United States v. Cali,* 87 F.3d 571, 580 (1st Cir.1996) (Decision to depart is only appropriate in "unusual or atypical" circumstances.); *United States v. Gaskill,* 991 F.2d 82, 85 (3d Cir.1993). The Commission has commented:

> When a court finds an atypical case, one to which a particular guideline linguistically applies but *where conduct significantly differs from the norm, the court may consider whether a departure is warranted.* Section 5H1.10 (Race, Sex, National Origin, Creed, Religion, and Socio–Economic Status), § 5H1.12 (Lack of Guidance as a Youth and Similar Circumstances), the third sentence of § 5H1.4 (Physical Condition, Including Drug Dependence and Alcohol Abuse), and the last sentence of § 5K2.12 (Coercion and Duress) list several factors that the court cannot take into account as grounds for departure. With those specific exceptions, however, the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case.

U.S.S.G. ch. 1, pt. A, intro. comment. (n.4(b)) (emphasis added).

■ In determining whether a circumstance is "unusual" or "atypical" and, therefore, capable of taking a case out of the applicable Guideline's "heartland," a district court should consider the Guidelines and the Commission's policy statements and official commentary. *Koon,* —— U.S. at ——, 116 S.Ct. at 2044; *Rybicki,* 96 F.3d at 756; *United States v. Artim,* 944 F.Supp. 363, 366 (D.N.J.1996).

■ The Commission has provided guidance by listing certain factors as either encouraged or discouraged bases for departure. *Koon,* —— U.S. at ——, 116 S.Ct. at 2045. "Encouraged factors are those 'the Commission has not been able to take into account fully in formulating the guidelines.' ... Discouraged factors, by contrast, are those 'not ordinarily relevant to the determination of whether sentence should be outside the applicable guideline range.'" *Id.,* at ——, 116 S.Ct. at 2045; *see Artim,* 944 F.Supp. at 366.

■ To determine whether departure from the Guidelines is appropriate, the following factors are taken into consideration:

(1) What features of this case, potentially, take it outside the Guideline's "heartland" and make of it a special, or unusual, case?

(2) Has the Commission forbidden departures based on those features?

(3) If not, has the Commission encouraged departures based on those features?

(4) If not, has the Commission discouraged departures based on those features?

*Koon,* —— U.S. at ——, 116 S.Ct. at 2045 (quoting *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993)).

■ A departure from the Guidelines may not be based upon a "forbidden" factor. *Koon,* —— U.S. at ——, 116 S.Ct. at 2043. For example, economic hardship may not be the basis of a downward departure because the Commission has determined that "personal financial difficulties and economic pressures upon a trade or business do not warrant a decrease in sentence." U.S.S.G. § 5K2.12. On the other hand, the Guidelines "encourage" departure based upon certain factors. For example, disruption of a governmental function is an "encouraged upward departure factor." *Koon,* —— U.S. at ——, 116 S.Ct. at 2045 (citing U.S.S.G. § 5K2.7). Departure based upon an "encouraged" factor is not appropriate, however, if the factor

is already taken into account by the applicable Guideline. *Id.*

Discouraged factors are those

'not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range.' 1995 U.S.S.G. ch. 5, pt. H, intro. comment. Examples include the defendant's family ties and responsibilities, 1995 U.S.S.G. § 5H1.6, his or her education and vocational skills, § 5H1.2, and his or her military, civic, charitable, or public service record, § 5H1.11. The Commission does not view discouraged factors "as necessarily inappropriate" bases for departure but says they should be relied upon only 'in exceptional cases.' 1995 U.S.S.G. ch. 5, pt. H, intro. comment.

*Koon,* —— U.S. at ——, 116 S.Ct. at 2045.

■ Finally, if a factor is not mentioned in the Guidelines, the court "must, after considering the 'structure and theory of both relevant individual guidelines and the Guidelines taken as a whole,' ... decide whether it is sufficient to take the case out of the Guideline's heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent.'" *Id.* (citations omitted).

Prior to the Court's decision in *Koon,* the Third Circuit followed a three-step process to determine whether departure from the Guidelines was permissible. *United States v. MacLeod,* 80 F.3d 860, 865 (3d Cir.1996). In step one, a court determines whether departure is permissible. *Id.* In step two, a court determines whether the facts support departure. *Id.* at 867. In step three, a court determines the appropriate degree of departure. *Id.*

The Third Circuit has not addressed the question of departure from the Guidelines since the *Koon* decision. The Fourth Circuit in *Rybicki,* however, prescribed an analysis for sentencing courts to follow in light of *Koon.* The *Rybicki* court provided:

1. The district court must first determine the circumstances and consequences of the offense of conviction....

2. The district court must then decide whether any of the circumstances or consequences of the offense of conviction appear "atypical," such that they potentially take the case out of the applicable guideline's heartland....

3. Having identified factors that may potentially remove a case from the applicable guideline's heartland, the district court must identify each according to the Guidelines' classifications as a "forbidden," "encouraged," "discouraged," or "unmentioned" basis for departure....

4. Factors that are "encouraged," "discouraged," or "unmentioned" require further analysis. "Encouraged" factors ... are usually appropriate bases for departure. But such factors may not be relied upon if already adequately taken into account by the applicable guideline, and that legal analysis involves interpreting the applicable guideline.... Conversely "discouraged" factors ... are "'not ordinarily relevant,'" but may be relied upon as bases for departure "'in exceptional cases'".... Finally, ... departures based on "unmentioned" factors ... may justify a departure where the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole" indicate that they take a case out of the applicable guideline's heartland.

5. As the last step, the district court must consider whether circumstances and consequences appropriately classified and considered take the case out of the applicable guideline's heartland and whether a departure from the guideline's specified sentencing range is therefore warranted.

*Rybicki,* 96 F.3d at 757–58.

### 2. *Grounds for Downward Departure*

As indicated, Barbara Bissell moved for a downward departure from the Guidelines. Barbara Bissell sought a downward departure based "mainly" upon Section 5K2.0 because of "extraordinary family responsibilities, susceptibility to abuse in prison, and reliance on professionals." Downward Departure Brief at 1. She also relied, in part,

upon Section 5K2.12, Coercion and Duress, and Section 5K2.13, Diminished Capacity. *Id.*

### a. *Section 5K2.0*

Section 5K2.0 provides:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

U.S.S.G. § 5K2.0.

The Commission has not listed all of the circumstances that may warrant departure from the Guidelines pursuant to Section 5K2.0. "The controlling decision as to whether and to what extent departure is warranted can only be made by the courts." U.S.S.G. § 5K2.0. "An offender characteristic or other circumstance that is not ordinarily relevant in determining whether a sentence should be outside the applicable Guideline range may be relevant to this determination *if such characteristic or circumstance is present to an unusual degree and distinguishes the case from the 'heartland' cases covered by the Guidelines in a way that is important to the statutory purposes of sentencing." Id.*

### 1. *Extraordinary Family Responsibilities*

Barbara Bissell is the mother of two teen-age daughters. She argued "the incarceration of their father for an extended period of time" will be a "serious loss" to her children.[43] Downward Departure Brief at 5. More to the point, she argued:

The incarceration of their mother as well will create a protracted nightmare for these teen-age girls as they move from adolescence to young womanhood with neither parent available to them for guidance, comfort, encouragement in the many changes their bodies, minds, and emotions

will undergo. This is a critical period of their development when their need for their mother is by far their major need and concern....

The ordeal these children have been through and will continue to endure is highly destructive to them and it is far more punishing than any child should experience. The loss of their mother under these circumstances will take a dreadfully excessive toll on both of these children.

These girls did nothing wrong to warrant such punishment. The [Motion for Downward Departure] should be granted to ameliorate the damage that is being done to these children.

Downward Departure Brief at 6.

■■■■ "Family ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6 (policy statement). Accordingly, "family ties and responsibilities" are a discouraged basis for departure from the Guidelines. *See Koon,* —— U.S. at ——, 116 S.Ct. at 2045. Only where a defendant's family responsibilities are "extraordinary" is it appropriate to depart. *United States v. Higgins,* 967 F.2d 841, 845 (3d Cir.1992). Barbara Bissell had "the burden of both production and persuasion." *Id.* at 846 n. 2.

Many defendants who face sentencing "shoulder responsibilities to their families, their employers, and their communities. Disruption of a defendant's life and concomitant difficulties for those who depend on a defendant, are inherent in the punishment of incarceration." *Gaskill,* 991 F.2d at 85 (citing *United States v. Johnson,* 964 F.2d 124, 127 (2d Cir.1992)); *see United States v. Reilly,* 33 F.3d 1396, 1424 n. 22 (3d Cir.1994); *Artim,* 944 F.Supp. at 366. Because "leaving children behind while in prison is a hardship common to many convicted parents, courts refuse to grant downward departures" on this basis. *United States v. Monaco,* 23 F.3d 793, 797 (3d Cir.1994) (citing *United States v. Shoupe,* 929 F.2d 116, 121 (3d Cir.), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116

---

**43.** This argument is affected by the death of Nicholas Bissell.

L.Ed.2d 333 (1991); *United States v. Headley,* 923 F.2d 1079, 1082–83 (3d Cir.1991)).

In *Headley,* the defendant argued for a departure on the basis that she was a single mother with five young children. 923 F.2d at 1082–83. The defendant lived with her five children who ranged in age from eleven months to eleven years. *Id.* at 1082. The district court declined to depart downward based upon the "psychological impact that a lengthy sentence would have on her five young children." *Id.* On appeal, the Third Circuit observed:

> While district courts have the authority to depart for extraordinary family circumstances, every court to consider the issue of departure based on the effect that sentencing a single parent to prison will have on minor children has found the circumstances not to be extraordinary.

*Headley,* 923 F.2d at 1083 (discussing *United States v. Brand,* 907 F.2d 31 (4th Cir.), *cert. denied,* 498 U.S. 1014, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990)) ("Although there doubtless are circumstances in which unique family responsibilities might justify a downward departure, the imprisonment of a single parent was not extraordinary."); *United States v. Goff,* 907 F.2d 1441, 1446 (4th Cir.1990)).

In *Goff,* the defendant was a single mother with three children, ages seven, six and two. 907 F.2d at 1446. The defendant testified her children would have to live with her mother who was ill if she was incarcerated. *Id.* At sentencing, the district court departed, in part, on the basis of the defendant's family responsibilities and for " 'the future of [the defendant's] children.' " *Id.* On appeal, the Fourth Circuit reversed and concluded "[t]here [was] nothing extraordinary about [the defendant's] family responsibilities and a decision to depart on that basis was improper." *Id.* The court explained: "Here [the defendant] 'has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts ... parental relationships.' " *Goff,* 907 F.2d at 1446.

■■■ There is no doubt the Bissell children have been hurt, both financially and emotionally, by the criminal activity and subsequent felony convictions of their parents, as well as the death of their father. There is no dispute that the ordeal they have been, and will be, subject to is "far more punishing than any child should experience." Downward Departure Brief at 6. It is, furthermore, certain the sentencing of their mother, Barbara Bissell, will be traumatic to the children. The disruption of the Bissell family, in and of itself, is not an "extraordinary circumstance" supporting a downward departure. As indicated, "the imposition of prison sentences normally disrupts ... parental relationships." *Goff,* 907 F.2d at 1447; *see also United States v. Shortt,* 919 F.2d 1325, 1328 (8th Cir.1990) ("[A]ll families suffer when one of their members go to prison....").

Barbara Bissell argues a downward departure is warranted because her children will suffer the pain of:

1. The loss of an intact family. The removal of their parents from their daily lives.

2. Public humiliation and embarrassment from unrelenting media attention to their parents.

3. Rejection by their peers because of their parents (sic) criminal behavior.

4. Incalculable worry and fear for the future for their parents and themselves.

5. Physical relocation and the dislocation of moving from an environment they have known all of their lives as home to housing they know not where.

6. Loss of stability and support in their daily lives.

7. Loss of the many activities in which they participated with their friends. (the swim team, soccer, softball, basketball, lacrosse, student counsel, newspaper club, and the yearbook committee. (sic)

8. Changing schools and the anxiety of this additional major change in their lives.

9. Loss of their three year old treasured boxer dog, Roxie, and their two cats, Ozzie and Jennifer.

10. The loneliness of experiencing important occasions without their parents (sic) participation such as Diana's eighth grade graduation, her confirmation, their birthdays, holidays, and other special occasions such as Alison's having her mother teach her to drive.

11. Moving from a middle class standard of living to partial reliance on government support for their subsistence.

Downward Departure Brief at 6.

The majority of the circumstances listed above relate to changes in the Bissell family financial circumstances and the separation caused by the indictment, trial, conviction and sentencing of Barbara Bissell. These are ordinary circumstances found in virtually every case where a single parent is sentenced to jail and, therefore, cannot fairly be considered extraordinary. *See e.g., Goff,* 907 F.2d at 1446.

The argument the children will have to move "to housing they know not where," as a circumstance supporting downward departure, is apparently a moot point. Barbara Bissell has indicated the children will be cared for by her mother and reside in East Brunswick, New Jersey. Barbara Bissell Presentence Investigation Report, ¶ 148.[44] In any event, this circumstance is not extraordinary.

As late as close of business on 2 December 1996, the Government strongly opposed the Motion for Downward Departure. Despite the flight and suicide of Nicholas Bissell, the Government argued there was no basis for departure from the Guidelines; Barbara Bissell's case was not extraordinary. Two days before sentencing, however, the Government reversed its position and consented to a "measured downward departure of 3 guidelines levels, under sections 5H1.6 and 5K2.0." [45] Downward Departure Letter at 3. The Government explained its change in position:

> The [G]overnment acknowledges that Nicholas Bissell's recent suicide alters the Bissell family's circumstances. His action shocked the community, but, most significantly, his action undoubtedly has had a devastating effect on his two teenage daughters. The circumstances that now exist are unique. As a result, the government now revises its position on defendant's motion and no longer opposes the request for downward departure.

Downward Departure Letter at 3.

The public suicide of Nicholas Bissell has undoubtedly had a devastating effect upon the Bissells' two teenage daughters. On 19 November 1996, following Nicholas Bissell's suicide, the Bissells' fifteen-year-old daughter required medical attention because of respiratory complaints. Her doctor diagnosed her condition as reactive depression to the death of Nicholas Bissell and reported:

> She has been having trouble with sleep, lack of energy, and lack of interest in school as well as in building relationships to her friends in school. Although she has never had a history of asthma, she has also recently started to complain of some shortness of breath when running. All of these are somatic complains (sic) for a lovely young lady who has been previously healthy.

Letter of Mei–Hui Wang, M.D., dated 4 December 1996.

---

**44.** Despite Barbara Bissell's representation to the Department of Probation that her children would be cared for by their Grandmother during any period of incarceration imposed, her attorney argued "neither grandparents are able to care for the girls because of health and other problems." Downward Departure Reply at 4. She did not, however, provide details of the grandparent's "health and other problems." At Sentencing, Barbara Bissell did not indicate a change in circumstances since her representation to the Department of Probation regarding her children. In fact, Barbara Bissell did not mention her children at sentencing.

**45.** In support of its revised position on the Motion for Downward Departure, the Government had submitted: Letter of Stuart Rabner, dated 4 December 1996 (the "Downward Departure Letter"). The Downward Departure Letter also purported to supported the Government's motion for a downward departure, pursuant to U.S.S.G. § 5K1.1, in recognition of Barbara Bissell's attempts to assist the efforts to locate Nicholas Bissell following his flight.

An educator, who asked that her name be kept confidential, reported her impression of the trauma the Bissells' thirteen-year-old daughter has experienced because of the suicide of her father:

> While [she] has demonstrated remarkable strength of character and resilience during the months since her parents' convictions, *the recent tragedy of her father's suicide has eroded what strength remained.* [She] has become much more introverted in school. She is devastated and embarrassed by the events surrounding her father's death. Her mother's impending sentencing has dealt her a very large measure of cruel reality that as an educator, I do not believe any 13 year old is prepared to accept.
>
> An adolescent girl who has lost one parent to a violent death does not need to lose her mother too. It is incomprehensible to me what it must be like to hear the graphic details of your father's death on the T.V., radio, and in the paper. There are so many far-reaching consequences of the trial and events that lead up to Mr. Bissell's death that will have to be resolved [for the Bissell children] ... to heal and get on with their lives.

Letter, dated 5 December 1996 (emphasis added).

As indicated, the family circumstances, described in the Motion for Downward Departure, are common to most families where a single parent is facing incarceration. For the most part, these circumstances relate to changes in the Bissell family financial circumstances and separation caused by the incarceration of Barbara Bissell. These circumstances were rejected as grounds for a downward departure.

The public suicide of Nicholas Bissell, however, made this case unique. As indicated, the public suicide of their father had a devastating effect on the Bissell children. For this reason, and this reason alone, a measured downward departure from the Guidelines was warranted.

The extent of departure was a difficult question. Barbara Bissell argued for no incarceration. Downward Departure Brief at 6. This was neither justified nor appropriate. Barbara Bissell was convicted of serious crimes. She was a full partner with her husband and assisted him in the criminal conduct. She was not a reluctant participant; the argument she was coerced and/or suffered from diminished capacity was insupportable.

The Government "recommend[ed] a sentence of imprisonment" but "consent[ed] to a measured downward departure of 3 guidelines levels." Downward Departure Letter at 3. The Government's choice of three-levels appeared arbitrary.

The compassion for the Bissell children must be tempered by the seriousness of Barbara Bissell's crimes. The Bissell children are not the only victims of Defendants' criminal activity. Balancing these competing concerns was difficult. No choice of the degree of departure was fully satisfactory; however, taking into consideration all of the circumstances, a downward departure of two-levels was appropriate.

### 2. *Reliance on Professionals*

■ As indicated, Barbara Bissell sought a downward departure because she relied upon professionals. Specifically, Barbara Bissell argued:

> Nicholas Bissell oversaw every task he instructed her to carry out. She had nothing to do with the preparation of any tax returns which were prepared by her husband and their accountant, Thomas Wagner. Her role encompassed only signing the documents that were placed before her. These men were not to be doubted or questioned. She relied on them to perform the functions they undertook with competence and propriety.

Downward Departure Brief at 8.

Reliance on professionals, as a ground for departure, is unmentioned in the Guidelines. As indicated, where a factor is unmentioned in the Guidelines, a court is instructed to consider "the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," and then "decide whether it is sufficient to take the case out of the Guideline's heartland." *Koon,* —— U.S. at ——, 116 S.Ct. at 2045.

A downward departure from the Guidelines based on Barbara Bissell's argued reliance on professionals was not warranted. At trial, it was established Barbara Bissell actively participated in the fraud on the Bedminster Station. Barbara Bissell, along with Nicholas Bissell, skimmed cash from the Bedminster Station's cash receipts. They diverted some of the cash into their personal bank accounts. Barbara Bissell, in her capacity as bookkeeper, and on some occasions Nicholas Bissell, wrote at least $65,000 worth of company checks to pay for personal items. *See* Barbara Bissell Presentence Investigation Report, ¶¶ 40–41. Barbara Bissell charged many of the personal charges paid for by the Bedminster Station. She also wrote the majority of the checks to American Express for these personal charges. Her car, moreover, was paid for by the Bedminster Station. *Id.*, ¶ 80. On 21 April 1995, Barbara Bissell lied to federal investigators, falsely denying paying for personal expenses from the business. *Id.*, ¶ 80.

Barbara Bissell was also convicted of tax evasion and subscribing to false returns. Notwithstanding her argument that "her role encompassed only signing the documents that were placed before her," Downward Departure Brief at 8, the evidence at trial demonstrated that Barbara Bissell played an active role in these offenses. Her role included forging Thornburg's signature to the Bedminster Station's 1992 tax return (the "1992 Tax Return"). Presentence Investigation Report, ¶ 84. The 1992 Tax Return falsely declared Barbara Bissell to be 100 percent owner of the Bedminster Station and asserted a fraudulent loss of $34,330. *Id.*

The proof at trial demonstrated Barbara Bissell knowingly engaged in the criminal activities for which she was charged and convicted. Barbara Bissell also knowingly accepted the proceeds of this criminal activity. Her argued reliance on professionals is disingenuous; it does not provide a basis for downward departure. This argument was rejected; the invitation to depart from the Guidelines was declined.

### 3. *Susceptibility to Abuse in Prison*

 Barbara Bissell also argued for a downward departure from the Guidelines be-cause she believes she is unusually susceptible to abuse in prison. Downward Departure Brief at 8–9 (relying on *Koon*, —— U.S. at ——, 116 S.Ct. at 2053). Susceptibility to abuse in prison, like "reliance on professionals," is not mentioned in the Guidelines.

In *Koon*, the petitioners were the infamous Los Angeles Police Officers who were filmed by a bystander beating Rodney King. —— U.S. at ——, 116 S.Ct. at 2041. The *Koon* petitioners and two other Los Angeles Police Officers were tried in State court on charges of assault with a deadly weapon and excessive use of force by a police officer. *Id.* They were acquitted of all charges in the State court prosecution, with the exception of one assault charge against one of the petitioners. *Id.* "The verdicts touched off widespread rioting in Los Angeles. More than 40 people were killed in the riots, more than 2,000 were injured, and nearly $1 billion in property was destroyed." *Id.* The petitioners were subsequently convicted in Federal court of violating King's constitutional rights and at sentencing the district court held that " '[t]he extraordinary notoriety and national media coverage of this case, coupled with the defendants' status as police officers, make [the petitioners] unusually susceptible to prison abuse.' " *Id.* at ——, 116 S.Ct. at 2053.

In the instant case, Barbara Bissell was the wife of the former Prosecutor of Somerset County. Because of her husband's former position, there has been a good deal media attention to the instant case. Despite this media attention, the instant case is not comparable to the *Koon* case. Barbara Bissell's fear of being a target of "special abuse in the prison system" does not provide a factual basis for downward departure; the invitation to depart from the Guidelines was declined.

### b. *Coercion, Duress and Diminished Capacity*

 As indicated, Barbara Bissell also moved for a downward departure on the ground of coercion, duress and diminished capacity. Duress may provide a defense to the crime charged where a defendant can

show (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm. *United States v. Santos,* 932 F.2d 244, 249 (3d Cir.), *cert. denied,* 502 U.S. 985, 112 S.Ct. 592, 116 L.Ed.2d 617 (1991). Barbara Bissell recognized duress "could [not] have provided [her] with a viable and complete offense at trial" but argues that it provided a basis for a downward departure at sentencing. Downward Departure Brief at 1, 7.

A downward departure on the basis of duress may be available where the defendant cannot establish duress as a defense to the crime charged. *United States v. Cheape,* 889 F.2d 477, 480 (3d Cir.1989) (citing Section 5K2.12). Section 5K2.12 provides:

If the defendant committed the offense because of *serious coercion, blackmail or duress,* under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency....

U.S.S.G. § 5K2.12 (emphasis added).

Barbara Bissell also argued she had a "personality flaw" which caused her to become "placid, unquestioning, and compliant" with regard to Nicholas Bissell. Downward Departure Brief at 7. She argued, Nicholas Bissell on the other hand was "'controlling,' 'domineering,' and sometimes 'mean,'" *id.,* and bullied her into not entering a plea.

Counsel for Barbara Bissell argued:

Barbara Bissell sought to enter a plea. She was continually mollified by her husband with promises each day that he would enter a plea at the proper time. He bul-

lied her not to plead because it would destroy her children if she testified and her testimony damaged his case. She cowered and he pressed on. His influence over her was substantial enough to cause her to disregard her plight whenever it conflicted with his wishes.

Downward Departure Brief at 7. It is important to observe Barbara Bissell never sought to plea in this case.

Barbara Bissell apparently argues her "personality flaw" provides a ground for a downward departure pursuant to Section 5K2.13. This section provides:

If the defendant committed a non-violent offense while suffering from *significantly reduced mental capacity* not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

U.S.S.G. § 5K2.13 (emphasis added).

Barbara Bissell must prove "serious coercion, blackmail or duress" and/or that she was suffering from "significantly reduced mental capacity" which contributed to the commission of the crime to be entitled for a downward departure on these bases. *Cheape,* 889 F.2d at 480–81; *Venezia v. United States,* 884 F.Supp. 919, 924 (D.N.J.1995).

In *Cheape,* the court held that in enacting Section 5K2.12, "the Commission did not require proof of immediacy or inability to escape; nor did it limit the feared injury to bodily injury." 889 F.2d at 480. Furthermore, because the guideline requires the court to consider "the circumstances as the defendant believed them to be," U.S.S.G. § 5K2.12, it appears to adopt a subjective standard for determining duress. *See United States v. Henderson–Durand,* 985 F.2d 970, 976 (8th Cir.) (Section 5K2.12 "allows the district court to consider the subjective mental state and personal characteristics of the defendant in its determination."), *cert. denied,* 510 U.S. 856, 114 S.Ct. 164, 126 L.Ed.2d 125 (1993).

The facts of *United States v. Hall*, 71 F.3d 569 (3d Cir.1995) provide an example of where a downward departure pursuant to Section 5K2.12 was appropriate. In *Hall*, the defendant pleaded guilty to conspiracy to commit bank fraud in several jurisdictions and related firearm violations. *Id.* at 570. She was sentenced to forty-six months of imprisonment and appealed, arguing, among other things, the district court failed to "recognize its discretion to consider her extraordinary circumstances as bases for a downward departure." *Id.* at 573. The Third Circuit determined there was "overwhelming evidence" that the "coercion and control" exercised by the defendant's husband contributed to her criminal activity. *Id.* The court observed the defendant

> had not been involved in any bank fraud schemes before she met [her husband], and, according to the forensics evaluation of the Bureau of Prisons, she continued her criminal activity only after he threatened to kill himself, to kill her, to hurt their friends and pets, and to commit bank robbery using violent means.... His own letters to [the defendant] from prison describe scenes from the past in which he threatened her with a gun.... These circumstances indicate that a departure may be appropriate under U.S.S.G. § 5K2.12,.... .

*Hall*, 71 F.3d at 573.

There was no basis for departure based upon either Section 5K2.12 and/or Section 5K2.13. The trial testimony and documentary evidence in the instant case indicated Barbara Bissell was a willing participant in her criminal activity. Her barely stated argument that she suffered from diminished capacity was unsubstantiated and appeared manufactured. There was no indication that she suffered from diminished capacity such to warrant a downward departure at sentencing. This argument was rejected; the invitation to depart from the Guidelines was rejected.

c. *Additional Grounds for Downward Departure*

Barbara Bissell advanced, for the first time in the Downward Departure Reply, "[a]dditional grounds for a downward departure ... because the total loss as calculated by the loss tables in this case significantly overstate[d] Barbara Bissell's criminality in both the mail fraud and the tax charges ... [and] the mental anguish she ha[d] been put through in the course of the past three years as a result of the actions directed and carried out by her spouse and others has been much more than what is commonly called 'overkill.' " Downward Departure Reply at 1–2 (citing *United States v. Monaco*, 23 F.3d 793, 799 (3d Cir.1994); *United States v. Kopp*, 951 F.2d 521, 531 (3d Cir.1991)). Barbara Bissell further argued: "The evidence in this case demonstrated that the initiation, planning and choreography of the conspiracy was conceived by :.. Wagner and Nicholas Bissell, Jr. There was certainly no direct evidence that Barbara Bissell read and understood the documents she signed." *Id.*

As indicated, the evidence at trial demonstrated Barbara Bissell was very much involved in the criminal activity for which she was convicted. The "mental anguish" she has suffered is common to defendants who face incarceration and did not provide a basis for downward departure. The invitation to depart from the Guidelines was declined.

d. *Downward Departure Conclusion*

The Motion for Downward Departure requested that Barbara Bissell's sentence be reduced because of her status as a "victim" of Nicholas Bissell. Barbara Bissell was not a victim. She had been convicted of the crimes for which she was charged. Her role in the criminal activity was far from insignificant.

Barbara Bissell's predicament, as the mother of two teenage girls who is facing a prison sentence, was sympathetic. As indicated, however, the disruption to the Bissell family caused by the incarceration of Barbara Bissell did not present a ground for taking her case out of the "heartland" of cases provided for in the Guidelines. The unique circumstances of the public suicide of Nicholas Bissell, however, did provide such a ground. Accordingly, the Motion for a Downward Departure was denied with the exception that a two-level downward depar-

ture was be made to take into consideration the devastation caused to the Bissell children by their father's public suicide.

### D. *Substantial Assistance*

On 4 December 1996, two days before the sentencing of Barbara Bissell, the Government moved for a downward departure, pursuant to U.S.S.G. § 5K1.1 ("Section 5K1.1") based upon "Barbara Bissell's cooperation with authorities after Nicholas Bissell's flight." Downward Departure Letter at 1. The Government reported the extent of Barbara Bissell's cooperation with the efforts to capture Nicholas Bissell and asked that "the full scope of her cooperation [be] considered at the time of sentencing." Downward Departure Letter at 2.

### 1. *Section 5K1.1*

Section 5K1.1 provides:

*Upon motion of the government* stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court *may* depart from the guidelines.

U.S.S.G. § 5K1.1 (emphasis added).

■ A district court has authority to depart from the Guidelines because of a defendant's "substantial assistance" only when the Government moves for departure. *Wade v. United States*, 504 U.S. 181, 185, 112 S.Ct. 1840, 1843, 118 L.Ed.2d 524 (1992); *United States v. Carrara*, 49 F.3d 105, 107 (3d Cir. 1995); *United States v. Love*, 985 F.2d 732, 734 (3d Cir.1993); *Higgins*, 967 F.2d at 845; *United States v. Gonzales*, 927 F.2d 139, 145 (3d Cir.1991); *United States v. Bruno*, 897 F.2d 691, 696 (3d Cir.1990); *see United States v. Kaye*, 65 F.3d 240, 242 (2d Cir. 1995); *United States v. Emery*, 34 F.3d 911, 913 (9th Cir.1994).

The "[F]ederal prosecutor [has] the power to evaluate in the first instance the extent and significance of the defendants' assistance to governmental authorities." *Love*, 985 F.2d at 735. In the instant case, the Government determined that, despite not completely disclosing all "potentially helpful information," Barbara Bissell provided sufficient assistance to warrant a two-level departure from the Guidelines. Government Downward Departure Letter at 2.

### 2. *The 5K1.1 Analysis*

■ As indicated, a court has authority to depart from the Guidelines because of a defendant's "substantial assistance" when the Government moves for departure. It does not follow, however, that if the Government files a 5K1.1 motion a court is obligated to grant a downward departure. A sentencing court retains the discretion to sentence criminals within the Guideline range. *United States v. Spiropoulos*, 976 F.2d 155, 159–63 (3d Cir.1992). "Having set the ... 5K1.1 downward departure process in motion, the [G]overnment cannot dictate the extent to which the court will depart." *Id.; see United States v. Conway*, 81 F.3d 15 (1st Cir.1996); *United States v. Organek*, 65 F.3d 60 (6th Cir.1995); *U.S. v. King*, 53 F.3d 589 (3d Cir.1995); *Carrara*, 49 F.3d at 107. For example, if the Government makes a 5K1.1 motion in a case where the defendant's assistance was insignificant, the sentencing court has the discretion to deny the Government's motion and sentence the defendant within the Guidelines. *Spiropoulos*, 976 F.2d at 161–64.

■ As explained in *Spiropoulos*, "[t]he critical point is that the Guidelines preserve the discretion of the district court with respect to the extent of ... 5K1.1 departures." *Id.* at 162. Indeed, the Circuit rejected the argument in *Spiropoulos* that a district court could not consider the "fortuitous events beyond [a defendant's] control" to measure cooperation. The Circuit acknowledged that the good-faith cooperation efforts by a defendant which led to the apprehension of an international drug lord or a local kingpin may well be entitled to a greater departure than a defendant whose good-faith efforts led to the apprehension of a low-level courier or no apprehension at all. *Id.* at 162. Succinctly stated: "The language of [Section] 5K1.1 directs a sentencing court to gage the extent and quality of the defendant's cooperation in deciding how many levels to depart downward in exchange for this cooperation." *King*, 53 F.3d at 591.

The court is charged with conducting a judicial inquiry into each individual case before independently determining the propriety and extent of any departure in the imposition of sentence. While giving appropriate weight to the government's assessment and recommendation, the court must consider all other factors relevant to this inquiry.

*Id.* at 591 (quoting with approval *United States v. Johnson,* 33 F.3d 8, 10 (5th Cir. 1994)).

The exercise of discretion concerning a 5K1.1 motion must center on the nature and extent of cooperation which must be evaluated on an individual basis; such consideration "does not admit of any sentencing 'practice.'" *King,* 53 F.3d at 590. In this regard, a sentencing court may consider "the significance and usefulness of the defendant's assistance, taking into consideration the Government's evaluation of the assistance rendered...." U.S.S.G. § 5K1.1.

"The language of [Section] 5K1.1 directs a sentencing court to gauge the extent and quality of the defendant's cooperation in deciding how many levels to depart downward in exchange for this cooperation.... A proper exercise of the district court's discretion under [Section] 5K1.1 ... involves an individualized qualitative examination of the incidents of the defendant's cooperation...." *King,* 53 F.3d at 591. "Obviously, a defendant's assistance is generally more 'useful' if it leads to a conviction then if the Government never uses the information once it is acquired." *Spiropoulos,* 976 F.2d at 161. In this regard the Circuit has explained that "the Guidelines specify that [a sentencing] court is specifically obligated to consider the Government's evaluation of the usefulness of that [cooperation]...." *Spiropoulos,* 976 F.2d at 160–61.

3. *Barbara Bissell's Cooperation*

■■■ The Government provided the full extent of Barbara Bissell's cooperation in three paragraphs:

On November 18, 1996, defendant Barbara Bissell agreed to speak with representatives of the U.S. Marshal's Service, the Postal Inspection Service, the FBI, and the U.S. Attorney's Office and respond to questions asked of her. [Barbara] Bissell stated that she was unaware of [Nicholas Bissell's] plans. Among other things, she advised authorities that he had taken certain bills, a cooler, and some food items. She also informed authorities that Nicholas Bissell had a new cell phone, which became the focal point of the investigation. In addition, defendant Barbara Bissell permitted authorities to look through the house for information. She remained available for questioning and assistance thereafter.

On November 25, 1996, defendant Barbara Bissell contacted authorities and notified them that she had received a telephone call from Nicholas Bissell at work. She advised that there had been a number of earlier hang-up calls received by others at her place of employment. During their one brief conversation at work, defendant Barbara Bissell made arrangements for her husband to call her at home that night. She advised authorities in advance of the call. Law enforcement officials arrived at her home toward the end of the planned conversation and Barbara Bissell accepted some guidance from them during the remainder of the call. Afterward, she summarized the conversation for law enforcement officials. In doing so, she relayed false information by Nicholas Bissell about his whereabouts and the missing Jeep, apparently intended by Nicholas Bissell to mislead law enforcement officials in their search. Defendant Barbara Bissell consented to allow authorities to tape record any future incoming calls. None were placed or received.

Defendant Barbara Bissell's information contributed to the U.S. Marshal's Service's ability to locate Nicholas Bissell. The information she provided was reliable and truthful. To be sure, defendant Barbara Bissell was not the only source of information regarding Nicholas Bissell's flight. Her information, coupled with other investigative leads pursued, resulted in the Marshal's Service finding Nicholas Bissell. Her cooperation was limited to the period from November 18, the day Nicholas Bis-

sell fled, to November 26. She did not provide potentially helpful information prior to her husband's flight. She did not notify authorities of certain information attributed to her in the media, namely, that her husband had sold household furniture and pocketed several thousand dollars in cash; nor did she advise law enforcement that he stopped shaving three to four days before his flight.

Downward Departure Letter at 1–2.

The Government explained the manner in which Barbara Bissell attempted to assist the authorities in the apprehension of Nicholas Bissell. It also conclusorily asserted the information Barbara Bissell provided "contributed to the U.S. Marshal's Service's ability to locate Nicholas Bissell." Downward Departure Letter at 2. The Government, however, did not adequately address the manner in which Barbara Bissell's cooperation "substantially assisted" the law enforcement officers who were pursuing Nicholas Bissell.

Following Nicholas Bissell's flight, "trap and trace" orders where signed for several telephones, including Barbara Bissell's home and work telephones. The Government requested that these be sealed, apparently not trusting the individuals involved, including Barbara Bissell. The technology used did not require Barbara Bissell to keep Nicholas Bissell on the line in order to effect a trace. At the Sentencing Hearing, the Government conceded the "[M]arshal [S]ervice would have been able to find Nicholas Bissell had [Barbara Bissell] done nothing." Sentencing Tr. at 22. The Government argued, however, that even though her information may have been cumulative, a downward departure was deserved because the "information provided by Barbara Bissell was timely, reliable, truthful and useful, and given at a time when she did not know the outcome and expected that her husband would be found." Id. at 23.

At the Sentencing Hearing, after argument on the 5K1.1 Motion, it was observed:

The 5K motion by the Government is among the weakest I have received since the federal guidelines have gone into effect. I've read and reread this motion and the cases surrounding it and the circumstances.

The Government's own papers point out ... [Barbara Bissell], did not provide potentially helpful information prior to her husband's flight. She did not notify authorities of certain information attributed to her in the media, namely that her husband had sold household furniture and pocketed several thousand dollars in cash nor did she advise law enforcement that he stopped shaving three to four days before his flight.

Sentencing Tr. at 27. The Government responded by acknowledging the seriousness of Barbara Bissell's crimes "must be balanced with [the] cooperation that she has offered and as [the court] accurately perceived [from the Government's] papers, this is a close question." Sentencing Tr. at 31.

The Government's decision to move for a downward departure in the instant case was surprising in light of its position in *United States v. Juliano,* 947 F.Supp. 777 (D.N.J. 1996). In *Juliano,* two defendants had entered into cooperating plea agreements (the "Plea Agreements") with the Government and for almost three years had fully cooperated with law enforcement officials. *Id.,* at 780. The Government agreed to move for a downward departure if their assistance proved substantial. *Id.* at 780. Despite acknowledging the good faith efforts of the defendants, the Government argued this assistance had not resulted in any "arrests, indictments or prosecutions" and, therefore, the defendants were not entitled to a downward departure. *Id.* at 782.

In *Juliano,* defense counsel argued the Government should consider the good faith efforts of the defendants to cooperate. *Juliano,* at 782. The Government responded the defendants would only be entitled to a 5K1.1 motion if they "were able to provide substantial assistance to the prosecution or investigation of other crimes ....." *Id.* at 783. Because, in the Government's evaluation, the good faith cooperation of the defendants had not resulted in substantial assistance, it declined to move for a downward departure. *Id.*

Recognizing that the nature and extent of each defendant's cooperation must be evalu-

ated on an individual basis and that such consideration "does not admit of any sentencing 'practice[,]' " *King,* 53 F.3d at 591, the Government's position in *Juliano* appeared inconsistent with its position in the instant case. In both cases, the defendants made a good faith effort to cooperate. In both cases, however, the cooperation did not provide substantial assistance to the Government.

Barbara Bissell's cooperation did not provide substantial assistance to the Government's efforts to locate Nicholas Bissell. Nicholas Bissell was located because of the extraordinary, prompt and efficient work of the United States Marshal Service. From the minute Nicholas Bissell fled, there was no question as to whether he would be apprehended, that was a virtual certainty. After individually considering the assistance provided by Barbara Bissell and giving due credit to the Government's evaluation of this assistance, the 5K1.1 Motion was denied.

### E. *Barbara Bissell's Sentence*

After reviewing the Department of Probation sentencing calculations and incorporating the two-level enhancement, pursuant to U.S.S.G. § 2T1.1(b)(1), the following was the resulting Guideline sentence range for Barbara Bissell.

| Group | Counts | Offense Level | Unit |
|-------|--------|---------------|------|
| 1. | Counts 12–16 | 16 | 1 |
| 2. | Counts 23–30 | 18 | 1 |

Pursuant to U.S.S.G. § 3D1.4, two-levels were added to the Group with the highest offense level. Accordingly, two-levels were added to Group Two's offense level of 18 for a combined offense level of 20 for Barbara Bissell.

Based upon Barbara Bissell's criminal history category of I and her combined offense level of 20, the Guidelines provided for a sentencing range of 33–41 months. U.S.S.G. Ch. 5 Pt. A (Sentencing Table).

As indicated, a two-level downward adjustment was made to Barbara Bissell's sentence because of the unique circumstance of the public suicide of Nicholas Bissell and the resultant trauma to the Bissell children. Accordingly, Barbara Bissell was sentenced based upon a combined offense level of 18

which in conjunction with her criminal history category of I resulted in a sentencing range of 27–33 months.

The serious nature of Barbara Bissell's crimes, her demonstrated failure to accept responsibility for her actions and her apparent lack of remorse justified the imposition of a sentence of imprisonment at the high end of the sentencing range. The events following Nicholas Bissell's flight, however, including Barbara Bissell's colorable attempts to assist law enforcement officials to apprehend him and the public suicide of Nicholas Bissell, weighed in favor of a sentence at the low end of the sentencing range. Barbara Bissell was sentenced to a term of 27 months.

### F. *Restitution*

 At sentencing, the Government argued that restitution should be ordered for Thornburg in the amount of $103,000. In addition to other penalties, a district court may order that restitution be paid to any victim of a defendant's offense. 18 U.S.C. § 3663(a)(1). In arriving at an appropriate amount, a district court is required to consider the amount of the loss sustained by any victim, the financial resources of the defendant and the financial needs and earning potential of the defendant and the defendant's dependents. 18 U.S.C. § 3664(a); *United States v. Logar,* 975 F.2d 958, 962 (3d Cir.1992). A district court is required to make factual findings concerning: (1) the amount of loss sustained by the victims; (2) the defendant's ability to make restitution, and (3) how the amount of restitution relates to the loss caused by the defendant's crimes. *Logar,* 975 F.2d at 962.

The Department of Probation reported Barbara Bissell's financial condition and ability to pay restitution:

[Barbara Bissell's] cash assets are minimal and she reports approximately $350 in account balances at Summit Bank. Her most significant asset is the equity in her residence at 238 Grandview Road, which is estimated at approximately $40,000. She has an additional $4,500 in equity from a condominium owned jointly with her husband located at 120 Bonny Court. [Barbara Bissell] earns approximately $1,500

each month, however her necessary monthly living expenses total almost $4,000. Currently she has a negative monthly cash flow and a significant amount of credit card debt and negates her existing assets. Based upon her current financial profile, it appears that she is not capable of paying a fine and/or restitution.

Barbara Bissell Presentence Investigation Report, ¶ 162.

At the Sentencing Hearing, the Government asked that Barbara Bissell be found able to pay the $103,000 amount owed to Thornburg and order restitution be made in this amount. Sentencing Tr. at 33. Despite the Department of Probation's determination Barbara Bissell is not capable of paying a fine and/or restitution, the Government argued restitution should be imposed against her earnings "into the future beyond whatever term of imprisonment" is imposed. *Id.* The Government further argued

> it is unclear at this point what, if anything, Barbara Bissell may derive from the estate, whether it be life insurance or some other proceeds and beyond that, in this instance, it would be reasonable for this [c]ourt to assume the possibility that ... Barbara Bissell could come into some money through a book or some other media arrangement....

Barbara Bissell Presentence Investigation Report at 33.

Barbara Bissell does not appear to have the financial ability to pay restitution. Barbara Bissell's future earning potential, based upon her employment history, does not support a conclusion she will be able to pay restitution following her release from prison. It does, however, appear realistically possible that Barbara Bissell may receive money from a book, interview, movie or some other commercial venture related to the instant case. It is appropriate to consider this possible source of income in fashioning a restitution order. *Logar*, 975 F.2d at 964.

At the Sentencing Hearing, the parties agreed with the suggestion that an order of restitution be fashioned so that restitution in the amount of $103,000 would be paid to Thornburg to be taken from any amount of money paid to Barbara Bissell from the proceeds of "a book, a movie, an interview or anything along those lines[.]" Sentencing Tr. at 35–37. Counsel for Barbara Bissell reported that her client "is not interested in any way in commercial benefit from this tragedy and the [c]ourt can fashion any kind of restitution order that would address itself to the commercial aspect." *Id.* at 37.

Restitution, from Barbara Bissell's current assets and her future regular income was not warranted. It, however, appeared reasonably foreseeable that she may receive money from a book, movie, interview or, in some other way, profit from her criminal activity and resulting notoriety; accordingly restitution was ordered for Thornburg in the amount of $103,000, limited to income from these sources.